# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION

## *There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices in Calendar Year 2005*

### April 2006

### Reference Number: 2006-10-070

This report has cleared the Treasury Inspector General for Tax Administration (TIGTA) disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Phone Number** | **202-927-7037**
**Email Address** | **Bonnie.Heald@tigta.treas.gov**
**Web Site** | **http://www.tigta.gov**

April 21, 2006

**MEMORANDUM FOR** CHIEF HUMAN CAPITAL OFFICER
CHIEF COUNSEL

FROM:            Michael R. Phillips /s/ Michael R. Phillips
Deputy Inspector General for Audit

**SUBJECT:**            Final Audit Report – There Was One
Administrative Action With Respect to Violations of Fair Tax
Collection Practices in Calendar Year 2005 (Audit # 200610018)

This report presents the results of our review of violations of Fair Tax Collection Practices. The overall objective of this review was to obtain information on any Internal Revenue Service (IRS)

# Exhibit B 1

administrative or civil actions resulting from Fair Tax Collection Practices [1] violations by IRS employees.  Section (§) 1102 (d)(1)(G) of the IRS Restructuring and Reform Act of 1998 [2] requires the Treasury Inspector General for Tax Administration to include in one of its Semiannual Reports to Congress information regarding any administrative or civil actions related to the violations of the fair debt collection provisions of 26 U.S.C. § 6304.

## Synopsis

Our review of 45 cases closed during the period January 1 through December 31, 2005, that were coded as Fair Debt Collection Practices Act (FDCPA) [3] violations, and an additional 169 employee misconduct cases that are similar in nature to FDCPA cases, identified 1 administrative action with respect to violations of Fair Tax Collection Practices.  However, there were no civil actions that resulted in the IRS paying monetary settlements to taxpayers because of a Fair Tax Collection Practices violation.

## Response

We made no specific recommendations as a result of the analyses performed during this audit.  However, IRS management reviewed a draft of this report and agreed with the facts and findings presented.

Copies of this report are being sent to the IRS managers affected by the report.  Please contact me at (202) 622-6510 if you have questions or Dan Devlin, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

# Table of Contents

**Background**

**Results of Review**

    There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices

    No Fair Tax Collection Practices Civil Actions Resulted in Monetary Settlements to Taxpayers

## Appendices

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Fair Tax Collection Practices Provisions

# *Background*

Section (§) 1102 (d)(1)(G) of the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) [4] requires the Treasury Inspector General for Tax Administration (TIGTA) to include in one of its Semiannual Reports to Congress information regarding any administrative or civil actions related to violations of the fair debt collection provisions of 26 U.S.C. § 6304, Fair Tax Collection Practices. [5] The IRS has traditionally referred to the 26 U.S.C. § 6304 violations as "Fair Debt Collection Practices Act" (FDCPA) [6] violations. The TIGTA Semiannual Report to Congress must provide a summary of such actions and include any judgments or awards granted.

The law itself does not provide an explanation of what is meant by "administrative actions." We used the IRS' definition when determining the number of FDCPA violations to be reported under RRA 98 § 1102 (d)(1)(G). The IRS' definition of administrative actions include disciplinary actions that range from admonishment to removal. Lesser actions, such as oral or written counseling, are not considered administrative actions.

As originally enacted, the FDCPA included provisions that restricted various collection abuses and harassment in the private sector. These restrictions did not apply to Federal Government practices. However, Congress believed that it was appropriate to require the IRS to comply with applicable portions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers (see Appendix IV for a detailed description of the FDCPA provisions). As such, RRA 98 § 3466(a) required the IRS to follow Fair Tax Collection Practices in line with the FDCPA.

Taxpayer complaints about IRS employees' conduct can be reported to several IRS functions for tracking on its management information systems. If a taxpayer files a civil action or if IRS management determines that the taxpayer's rights related to Fair Tax Collection Practices were

potentially violated, the complaint could be referred and then tracked on one or both of the following IRS systems:

- Office of Workforce Relations' Automated Labor and Employee Relations Tracking System (ALERTS), which generally tracks employee behavior that may warrant IRS management administrative actions.

- Office of Chief Counsel's Counsel Automated System Environment (CASE), which is an inventory control system that tracks items such as taxpayer civil actions or bankruptcies.

The IRS began tracking FDCPA codes on the ALERTS in March 1999 and on the CASE in June 1999.

For the Calendar Year 2005 review, we analyzed closed cases from the ALERTS and the CASE to identify violations of Fair Tax Collection Practices. However, we could not ensure the cases recorded on the ALERTS and the CASE constitute all Fair Tax Collection Practices violations. Furthermore, the scope of our audit was not intended to determine the accuracy or consistency of disciplinary actions taken against employees for Fair Tax Collection Practices violations that were not reported to the Office of Workforce Relations.

This review was performed at the Chief Human Capital and Chief Counsel Offices in the IRS National Headquarters in Washington, D.C., during the period January to March 2006. The audit was conducted in accordance with *Government Auditing Standards*. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

# *Results of Review*

## *There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices*

There were 45 cases initially coded as FDCPA complaints closed on the ALERTS during the period January 1 through December 31, 2005. [7] However, only 14 of the 45 cases involved administrative actions being taken against employees. Of the 14 cases with administrative actions, none were a violation of the FDCPA; 12 cases were miscoded in the ALERTS, and the allegations related to the FDCPA were not substantiated for the other 2 cases. Most of the miscoded cases involved unprofessional conduct of employees.

Because of the high number of miscoded cases, we also reviewed 169 additional cases involving

employee misconduct allegations that are similar in nature to violations of Fair Tax Collection Practices and identified 1 case that was an FDCPA violation. The case involved an IRS employee using profane language in the presence of a taxpayer or taxpayer's representative while in the course of performing official duties. The case should have been coded as a violation of Fair Tax Collection Practices instead of unprofessional conduct of an employee. The employee left the IRS in lieu of removal.

Oral or written counseling is not considered an administrative action under the IRS' definition. Since the IRS does not routinely track all informal oral counseling or minor actions against its employees, it is not possible to determine how often, and for what reasons, informal oral counseling or other minor disciplinary actions occurred.

## No Fair Tax Collection Practices Civil Actions Resulted in Monetary Settlements to Taxpayers

Section 7433 of the Internal Revenue Code provides that a taxpayer may bring a civil action for damages against the Federal Government if an officer or employee of the IRS recklessly or intentionally, or by reason of negligence, disregards any provision of the Internal Revenue Code, or related regulation, in connection with the collection of Federal tax.

There were no cases closed on the CASE for which the IRS paid damages to taxpayers resulting from a civil action filed due to a Fair Tax Collection Practices violation.

**Appendix I**

# Detailed Objective, Scope, and Methodology

The overall objective of this audit was to obtain information on any Internal Revenue Service (IRS) administrative or civil actions resulting from Fair Tax Collection Practices (FTCP)[8] violations by IRS employees. Specifically, we:

I.    Identified the number of FTCP violations resulting in administrative actions.

    A.    Obtained a computer extract from the Automated Labor and Employee Relations Tracking System (ALERTS)[9] of any cases opened after July 22, 1998, coded as Fair Debt Collection Practices Act[10] violations (Issue Codes 141 to 147), and closed during the period January 1 through December 31, 2005. We analyzed the ALERTS extract and obtained additional case file information from the Labor

There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices in Calendar Year 2005

Relations function, if needed, to determine the type of violation.

B.       Determined if any cases involving FTCP violations resulted in administrative actions.

C.       Obtained a computer extract from the ALERTS of any cases opened after July 22, 1998, with the following Issue Codes:

- 058 (Unprofessional Conduct - limited to only those closed with a disposition code of 009 or higher).

- 114 (Conviction Assault/Battery - all disposition codes).

- 119 (Threat of Audit/Personal - all disposition codes).

- 999 (Not Otherwise Coded - limited to only those closed with a disposition code of 009 or higher) and closed during the period January 1 through December 31, 2005.

Note:  We did not attempt to independently validate the accuracy of the complete ALERTS database for this review.  We limited our work to only assess the accuracy of the Issue Codes for those cases which met our criteria as listed in steps I.A through I.C.

II.       Identified the number of FTCP violations resulting in IRS civil actions (judgments or awards granted) by obtaining a computer extract from the Counsel Automated System Environment [11] database of any Subcategory 6304 (established to track FTCP violations) cases opened after July 22, 1998, and closed during the period January 1 through December 31, 2005.  The Office of Chief Counsel identified no cases.

**Appendix II**

# _Major Contributors to This Report_

Daniel R. Devlin, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)
Carl L. Aley, Acting Director
Kevin P. Riley, Audit Manager
Tom J. Cypert, Lead Auditor
Frank I. Maletta, Auditor
William E. Thompson, Auditor

**Appendix III**

## *Report Distribution List*

Commissioner  C
Office of the Commissioner – Attn:  Chief of Chief  C
Deputy Commissioner for Operations Support  OS
Director, Workforce Relations  OS:HC:R
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Management Controls  OS:CFO:AR:M
Audit Liaisons:  Chief Counsel  CC
　　　　　　 Chief Human Capital Officer  OS:HC

**Appendix IV**

## *Fair Tax Collection Practices Provisions*

To ensure equitable treatment among debt collectors in the public and private sectors, the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 [12] requires the IRS to comply with certain provisions of the Fair Debt Collection Practices Act. [13]  Specifically, the IRS may not communicate with taxpayers in connection with the collection of any unpaid tax:

- At unusual or inconvenient times.

- If the IRS knows that the taxpayer has obtained representation from a person authorized to practice before the IRS, and the IRS knows or can easily obtain the representative's name and address.

- At the taxpayer's place of employment, if the IRS knows or has reason to know that such communication is prohibited.

Further, the IRS may not harass, oppress, or abuse any person in connection with any tax collection activity or engage in any activity that would naturally lead to harassment, oppression, or abuse.  Such conduct specifically includes, but is not limited to:

- Use or threat of violence or harm.

There Was One Administrative Action With Respect to Violations of Fair Tax Collection Practices in Calendar Year 2005

- Use of obscene or profane language.

- Causing a telephone to ring continuously with harassing intent.

- Placement of telephone calls without meaningful disclosure of the caller's identity.

---

[1]
   26 U.S.C. § 6304 (2004).

[2]
   Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).

[3]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000). The IRS has traditionally referred to the Fair Tax Collection Practices violations under 26 U.S.C. § 6304 as "Fair Debt Collection Practices Act" violations.

[4]
   Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).

[5]
   26 U.S.C. § 6304 (2004).

[6]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).

[7]
   This included cases opened after July 22, 1998, and closed during the period January 1 through December 31, 2005.

[8]
   26 U.S.C. § 6304 (2004).

[9]
   The Office of Workforce Relations' ALERTS generally tracks employee behavior that may warrant IRS management administrative actions.

[10]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).

[11]
   The Counsel Automated System Environment is an Office of Chief Counsel inventory control system that tracks items such as taxpayer civil actions or bankruptcies.

[12]
   Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).

[13]
   15 U.S.C. §§ 1601 note, 1692-1692o (2000).

# Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

## July 2005

## Reference Number: 2005-40-104

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

July 5, 2005

## MEMORANDUM FOR DEPUTY COMMISSIONER FOR SERVICES AND ENFORCEMENT
## DEPUTY COMMISSIONER FOR OPERATIONS SUPPORT

FROM: *(for)* Pamela J. Gardiner */s/ Margaret E. Begg*
Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Audit # 200440052)

This review presents the results of our review of the Internal Revenue Service's (IRS) use of the designation "Illegal Tax Protester" (ITP) and similar designations. The overall objective of this review was to determine whether the IRS complied with IRS Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 and internal IRS guidelines that prohibit IRS officers and employees from referring to taxpayers as ITPs or any similar designations.

Prior to enactment of the RRA 98, taxpayers were referred to the ITP Program when their tax returns or correspondence contained specific indicators of noncompliance with the tax law, such as the use of arguments that had been repeatedly rejected by the courts. Once a taxpayer's account was coded as an ITP, certain tax enforcement actions were accelerated. The designation was also intended to alert IRS employees to be cautious so they would not be drawn into confrontations with taxpayers.

RRA 98 § 3707 prohibits the IRS from referring to taxpayers as ITPs or any similar designations. The Treasury Inspector General for Tax Administration (TIGTA) is required to annually evaluate IRS compliance with the prohibition on the use of ITP or any similar designations.

In summary, the IRS has not reintroduced past ITP codes on the Master File, and formerly coded ITP taxpayer accounts have not been assigned similar Master File designations. In addition, the IRS does not have any current publications with ITP references and has initiated actions to remove ITP references from the various forms of the Internal Revenue Manual (IRM).

In 309 isolated instances, IRS employees continued to make references to taxpayers as ITPs and other similar designations in case narratives. The IRS has taken steps in directing its employees to prevent ITP and similar designations from appearing in case narratives. However, in its response to our Fiscal Year (FY) 2003 report, the IRS disagreed with our determination that, to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case narratives. As a result, we elevated this disagreement to the Assistant Secretary for Management and Chief Financial Officer of the Treasury but have not yet received a response.

**Exhibit B 2**

**Management's Response**: Since the IRS Office of the Chief Counsel issued an opinion that references to taxpayers as ITPs or similar designations in case narratives are not a violation of RRA 98 § 3707, the IRS continues to disagree with our determination on this issue. As a result, the IRS does not concur with our outcome measure as claimed. In addition, the IRS stated that all ITP designations will be removed from the IRM by the end of FY 2005. We will confirm whether all ITP designations have been removed from the IRM during next year's mandatory review. Management's complete response to the draft report is included as Appendix VII.

**Office of Audit Comment**: We continue to believe it is reasonable to conclude that, based upon the language of RRA 98 § 3707, IRS officers and employees should not label taxpayers as ITPs or similar designations in any IRS records, which include paper and electronic case files. IRS officers and employees should not designate taxpayers as ITPs or similar designations because such a designation alone contains a negative connotation and appears to label the taxpayer.

RRA 98 § 3707 provides that officers and employees of the IRS shall not designate taxpayers as ITPs or any similar designations. While there is little interpretive information provided concerning this provision, the Senate Committee Report (S. Rep. No. 105-174) states that the Committee is concerned taxpayers might be stigmatized by designation as an ITP. Further, the Report's explanation of this provision states that existing designations in the Master File must be removed and any other designations, such as on paper records that have been archived, must be disregarded.

We have not reported that those taxpayers designated by IRS employees as ITPs or similar designations have been harmed by these designations. Only a thorough review of each taxpayer's case and the treatment accorded the taxpayer would determine if these taxpayers have been harmed. Because the TIGTA is required to annually evaluate the IRS' compliance with this provision of the law, we have elevated the disagreement about whether employees are labeling taxpayers as ITPs to the Department of the Treasury and encourage the IRS to raise the issue as well.

Copies of this report are also being sent to the IRS managers affected by the report results. Please contact me at (202) 622-6510 if you have questions or Michael R. Phillips, Assistant Inspector General for Audit (Wage and Investment Income Programs), at (202) 927-0597.

# Table of Contents

Background

Illegal Tax Protester Codes Were Not Used on the Master File

Internal Revenue Service Publications Do Not Contain Illegal Tax Protester References

The Internal Revenue Service Has Initiated Steps to Remove Illegal Tax Protester References From the Internal Revenue Manual

Employees Used Illegal Tax Protester or Similar Designations in Isolated Instances in Case Narratives

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Use of Illegal Tax Protester and Similar Designations in Case Narratives by Internal Revenue Service Employees During Fiscal Years 2003, 2004, and 2005

Appendix VI -- Examples of Illegal Tax Protester and Similar Designations Found in Case Narratives

Appendix VII -- Management's Response to the Draft Report

## Background

Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 prohibits the IRS from referring to taxpayers as Illegal Tax Protesters (ITP) or any similar designations. In addition, the RRA 98 requires the removal of all existing ITP codes from the IRS Master File and instructs IRS employees to disregard any such designation not located on the Individual Master File.

Prior to enactment of the RRA 98, taxpayers were referred to the ITP Program when their tax returns or correspondence contained specific indicators of noncompliance with the tax law, such as the use of arguments that had been repeatedly rejected by the courts. Once a taxpayer's account was coded as an ITP, certain tax enforcement actions were accelerated. The designation was also intended to alert IRS employees to be cautious so they would not be drawn into confrontations with taxpayers.

The Congress had concerns that some taxpayers were being permanently labeled and stigmatized by the ITP designation. Taxpayers who subsequently complied with the tax laws could continue to be labeled as ITPs, which could bias IRS employees and result in unfair treatment.

Internal Revenue Code § 7803(d)(1)(A)(v) (2000) requires the Treasury Inspector General for Tax Administration to annually evaluate IRS compliance with the prohibition against using ITP or any similar designations. This is our seventh review since Fiscal Year (FY) 1999. These reviews have identified areas for improvement to help the IRS comply with the ITP designation prohibition.

This review was performed in the Appeals function, Criminal Investigation function, National Taxpayer Advocate function, and Office of Chief Counsel in Washington, D. C.; the Small Business/Self-Employed (SB/SE) Division in New Carrollton, Maryland; and the Wage and Investment (W&I) Division in Atlanta, Georgia, during the period September 2004 through April 2005. The audit was conducted in accordance with *Government Auditing Standards*. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.

### Illegal Tax Protester Codes Were Not Used on the Master File

In prior reviews, we reported the IRS had removed the ITP codes from the Master File as required by RRA 98 § 3707. The ITP designation has not been reintroduced on the Master File.

RRA 98 § 3707 also prohibits using any designation similar to ITP. A review of the approximately 57,000 taxpayer accounts formerly coded as ITPs on the Master File identified no reassignments of these taxpayer accounts to any other Master File designation similar to ITP.

### Internal Revenue Service Publications Do Not Contain Illegal Tax Protester References

To help promote compliance with RRA 98 § 3707, IRS management issued directives for employees to update various publications to eliminate references to ITP terminology and programs. A review of IRS publications identified no ITP references.

### The Internal Revenue Service Has Initiated Steps to Remove Illegal Tax Protester References From the Internal Revenue Manual

In each of the six prior reviews, we identified multiple subsections throughout the various forms of the Internal Revenue Manual (IRM) that contained ITP references. During our FY 2004 review, we reported that there were 24 unique ITP references throughout the various forms of the IRM. In response to our report, the IRS stated that it had initiated actions to remove all remaining ITP references from the IRM.

In our current review, we found 19 unique ITP references in various versions of the IRM. Office of Chief Counsel management had already updated and removed 18 of

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

these references from their functional IRM maintained on the IRS Intranet. IRS management informed us that 18 of the 19 references we identified should be removed as other IRM versions are updated to incorporate functional IRM revisions. One additional ITP reference was identified in the SB/SE Division functional IRM. In January 2005, we notified SB/SE Division management of this remaining ITP reference for correction.

Removing all ITP references from the various forms of the IRM would prevent IRS employees from being inadvertently encouraged to improperly label taxpayers as ITPs. Based on the actions taken, we believe no further recommendations are warranted at this time.

Employees Used Illegal Tax Protester or Similar Designations in Isolated Instances in Case Narratives

Our FY 2005 review of a sample of computer systems used by IRS employees to document case activity identified 309 isolated instances in which 272 employees designated taxpayers as "tax protesters," "ITPs," "constitutionally challenged," or other similar designations. These actions are prohibited by RRA 98 § 3707. However, employees are allowed to document any statements made by a taxpayer or his or her representatives, and quoting a taxpayer's self-designation as an ITP is not prohibited by RRA 98 § 3707. A chart detailing where inappropriate IRS employee comments were made can be found in Appendix V, and examples of the inappropriate comments can be found in Appendix VI.

The IRS has taken steps in directing its employees to prevent ITP and similar designations from appearing in case narratives. On October 11, 2002, the IRS issued a Servicewide Electronic Research Program (SERP) alert reminding employees of the prohibition regarding the use of ITP or any similar designations. Business and functional units independently continued to take additional steps to address this issue. These included sending out additional guidance in the form of SERP alerts, email alerts, and memoranda; updating training; conducting quality reviews for ITP use; and counseling employees that continued to designate taxpayers as ITPs or other similar designations.

However, in response to our FY 2003 report, the IRS disagreed with our determination that, to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case narratives. As a result, we elevated this disagreement to the Assistant Secretary for Management and Chief Financial Officer of the Treasury but have not yet received a response.

We believe it is reasonable to conclude that, based upon the language of the statute, IRS officers and employees should not label taxpayers as ITPs or similar designations in any IRS records, which include paper and electronic case files. IRS officers and employees should not designate taxpayers as ITPs or similar designations because such a designation alone contains a negative connotation and appears to label the taxpayer.

In isolated instances, employees referred to taxpayers specifically using ITP or similar designations in case narratives input on the following IRS computer systems between October 2003 and September 2004:

• Appeals Centralized Database System (ACDS): A review of 93,961 open Appeals narrative comment records identified 1 case in which 1 employee used similar designations when referring to a taxpayer in his or her case narrative.

• Automated Collection System (ACS): A review of approximately 2.4 million open ACS records identified 49 cases in which 44 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

• Criminal Investigation Management Information System (CIMIS): A review of 19,020 open and closed cases identified 3 cases in which 3 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

• Integrated Collection System (ICS): A review of approximately 1.1 million open ICS records identified 214 cases in which 187 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

• Taxpayer Advocate Management Information System (TAMIS): A review of 34,537 open TAMIS records identified 2 cases in which 2 employees used ITP or similar designations when referring to specific taxpayers in their case narratives.

• Taxpayer Information File (TIF): A review of approximately 17.2 million open TIF records identified 40 history notations in which 35 employees used ITP or similar designations when referring to specific taxpayers in the Activity Code field of the TIF.

This is the first year we evaluated the Activity Code field on the TIF. In addition to the 40 account history notes input between October 2003 and September 2004, we

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

identified 315 additional instances in which account history notes contained ITP or similar designations input prior to and after FY 2004.

We notified W&I Division and SB/SE Division management of the instances in which employees had used the account history notes section on the TIF to label taxpayers as ITPs or similar designations. W&I Division management immediately issued an alert to remind employees not to designate taxpayers as ITPs or anything similar in the account history notes. W&I Division management is also working with SB/SE Division management to eliminate the existing ITP and similar designations from the TIF.

In addition, we identified 116 instances in various case narratives in which employees had made references or inferences about the taxpayers' actions (e.g., taxpayer sent letters containing "typical protester language" or the taxpayer responded with "protester jargon"). We agree with the IRS that merely making references to a taxpayer's actions does not constitute a designation prohibited by this statutory provision. However, we are concerned these references could become, or be considered, permanent labels that could subsequently stigmatize taxpayers in future contacts with the IRS.

Since the IRS has previously taken actions to address many of these issues and there is an outstanding question concerning the legal interpretation of RRA 98 § 3707, we believe no further recommendations are needed at this time.

## Detailed Objective, Scope, and Methodology

The objective of this review was to determine whether the Internal Revenue Service (IRS) complied with IRS Restructuring and Reform Act of 1998 (RRA 98) Section (§) 3707 and internal IRS guidelines that prohibit IRS officers and employees from referring to taxpayers as Illegal Tax Protesters (ITP) or any similar designations. The Treasury Inspector General for Tax Administration (TIGTA) is required to annually evaluate the IRS' compliance with the prohibition against using ITP or any similar designations. To complete this objective, we:

I.     Determined if the ITP coding on the IRS Master File was removed by reviewing all Accelerated Issuance Codes (Transaction Code 148) as of November 2004 for Business Master File (BMF) records and Individual Master File (IMF) records. We analyzed 102,860 BMF records and 614,246 IMF records containing a Transaction Code 148 on the account. We generally relied on the TIGTA Office of Information Technology for validation of the data provided to us. However, we did a limited validation of the data by researching a judgmental sample of 25 Taxpayer Identification Numbers (TIN) and 25 Employer Identification Numbers on the Integrated Data Retrieval System (IDRS).

We also compared our historic computer extract of approximately 57,000 taxpayers designated as ITPs before the RRA 98 was enacted to our BMF and IMF records with an Accelerated Issuance Code (Transaction Code 148) to determine if any new common codes were being used to classify the taxpayers as ITPs.

II.     Determined if the IRS Internal Revenue Manual (IRM) contained ITP or any similar designations by performing key word searches of the Servicewide Policy, Directive, and Electronic Research system; the Servicewide Electronic Research Program (SERP); the IRS electronic publishing Intranet web site, the IRS public Internet web site; and paper IRMs in December 2004. In addition, we determined if the Chief Counsel Directives Manual located on the IRS Office of Chief Counsel web site contained ITP or any similar designations by performing key word searches in December 2004. We specifically searched for corrections to the exceptions identified in our Fiscal Year 2004 report and determined if there were any new references.

III.     Determined if IRS publications still contained ITP or any similar designations by performing key word searches of the SERP, the IRS public Internet web site, and the IRS electronic publishing Intranet web site in October 2004 and the IRS 2004 Federal Tax Products CD-ROM in December 2004.

IV.     Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Integrated Collection System (ICS) by securing a copy of the ICS database and analyzing 1,083,521 ICS records open as of September 2004 with history action dates between October 2003 and September 2004. We did not perform a detailed validation of the ICS data because this information was provided directly from the IRS through the TIGTA Data Center Warehouse (DCW). However, we did a limited validation of the data by matching a judgmental sample of 25 TINs to the IDRS to determine if the accounts were in current collection status.

Appendix I

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

V.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Automated Collection System (ACS) by securing a copy of the ACS database and analyzing 2,398,739 ACS records open as of September 2004 with history action dates between October 2003 and September 2004. We did not perform a detailed validation of the ACS data because this information was provided directly from the IRS through the TIGTA DCW. However, we did a limited validation of the data by matching a judgmental sample of 25 TINs to the IDRS to determine if the accounts were in current collection status.

VI.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Taxpayer Advocate Management Information System (TAMIS) by securing a copy of the TAMIS database and analyzing 34,537 open TAMIS records with activity between October 2003 and September 2004. The Taxpayer Advocate Service provided the data and validation information to us. The TIGTA DCW staff validated the TAMIS data received. In addition, we did a limited validation of data accuracy and completeness by looking up a judgmental sample of 25 cases by accessing TAMIS online.

VII.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Appeals Centralized Database System (ACDS) by securing a copy of the ACDS database and analyzing 93,961 open Appeals narrative comment records identified as received in the Appeals function between October 2003 and September 2004. The data were provided directly from the IRS through the TIGTA DCW. However, we did a limited validation of data accuracy and completeness by looking up a judgmental sample of 31 case records by accessing the ACDS online.

VIII.    Determined if employees were using ITP or any similar designations within taxpayer case narratives on the IRS Criminal Investigation Management Information System (CIMIS) by securing a copy of the CIMIS database and analyzing 19,020 cases opened on the CIMIS between October 2003 and September 2004. The data were provided directly from the IRS and validated by the TIGTA Chicago Audit group.

IX.    Determined if employees were using ITP or any similar designations on the Taxpayer Information File (TIF) by analyzing 12,341,522 IMF and 4,901,558 BMF taxpayer accounts open on the IDRS as of January 2005 with Activity Code dates input between October 2003 and September 2004. Since this was the first year we looked at the Activity Code field on the TIF, we also looked at taxpayer accounts that contained ITP or similar designations input before October 2003 and after September 2004.

---

## Major Contributors to This Report

Appendix II

Michael R. Phillips, Assistant Inspector General for Audit (Wage and Investment Income Programs)
Mary V. Baker, Director
Bryce Kisler, Audit Manager
Alan Lund, Lead Auditor
Tanya Boone, Senior Auditor
Julia Tai, Senior Auditor
Craig Pelletier, Auditor

---

## Report Distribution List

Appendix III

Commissioner  C
Office of the Commissioner – Attn: Chief of Staff  C
Commissioner, Small Business/Self-Employed Division  SE:S
Commissioner, Wage and Investment Division  SE:W

Chief, Appeals  AP
Director, Office of Research, Analysis, and Statistics  RAS
Chief, Criminal Investigation  SE:CI
Chief Information Officer  OS:CIO
Director, Communications and Liaison, National Taxpayer Advocate  TA:CCL
Director, Office of Servicewide Policy, Directives, and Electronic Research  RAS:SPDER
Director, Collection, Small Business/Self-Employed Division  SE:S:C
Chief Counsel  CC
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Management Controls  OS:CFO:AR:M
Audit Liaisons:

Director, Communications, Government Liaison, and Disclosure, Small Business/Self-Employed Division  SE:S:CGL&D
Director, Compliance, Wage and Investment Division  SE:W:CP
Acting Director, Strategy and Finance, Wage and Investment Division  SE:W:S
Acting Chief, Performance Improvement, Wage and Investment Division  SE:W:S:PI

GAO/TIGTA Liaison, Deputy Commissioner for Operations Support  OS
GAO/TIGTA Liaison, Deputy Commissioner for Services and Enforcement  SE
GAO/TIGTA Liaison, National Taxpayer Advocate  TA
GAO/TIGTA Liaison, Appeals  AP:P:S
Acting Chief, Customer Liaison, Small Business/Self-Employed Division  SE:S:COM
Acting Senior Operations Advisor, Wage and Investment Division  SE:W:S
GAO/TIGTA Liaison, Chief Information Officer  OS:CIO:SM:PO
GAO/TIGTA Liaison, Criminal Investigation  SE:CI:S:PS

## Outcome Measures

**Appendix IV**

This appendix presents detailed information on the measurable impact that the review results will have on tax administration. While no recommendations were made in this report, the Treasury Inspector General for Tax Administration has made prior recommendations that continue to provide benefits. These benefits will be incorporated into our Semiannual Report to the Congress.

Type and Value of Outcome Measure:

- Taxpayer Rights and Entitlements – Actual; 309 taxpayers affected (see page 3).

Methodology Used to Measure the Reported Benefit:

We reviewed the following:

- From the Appeals Centralized Database System (ACDS) – a total of 93,961 open Appeals narrative comment records received between October 2003 and September 2004 and identified 1 case narrative that contained Illegal Tax Protester (ITP) or a similar designation.

- From the Automated Collection System (ACS) – approximately 2.4 million records open as of September 2004 from a database with history action dates between October 2003 and September 2004 and identified 49 taxpayer case narratives that contained ITP or a similar designation.

- From the Criminal Investigation Management Information System (CIMIS) – a total of 19,020 cases opened between October 2003 and September 2004 and identified 3 taxpayer case narratives that contained ITP or a similar designation.

- From the Integrated Collection System (ICS) – approximately 1.1 million records open as of September 2004 from a database with history action dates between October 2003 and September 2004 and identified 214 taxpayer case narratives that contained ITP or a similar designation.

- From the Taxpayer Advocate Management Information System (TAMIS) – a total of 34,537 open cases with activity between October 2003 and September 2004 and identified 2 taxpayer case narratives that contained ITP or a similar designation.

- From the Taxpayer Information File (TIF) – approximately 17.2 million taxpayer accounts open on the IDRS as of January 2004 with TIF Activity Code dates input between October 2003 and September 2004 and identified 40 taxpayer history notations that contained ITP or a similar designation.

Type and Value of Outcome Measure:

- Reliability of Information – Actual; 19 unique Internal Revenue Manual (IRM) subsections (see page 2).

Methodology Used to Measure the Reported Benefit:

In December 2004, we searched various versions of the IRM available to Internal Revenue Service (IRS) employees for ITP references. These were found on the Servicewide Electronic Research Program (SERP), the IRS publishing web site, the IRS public Internet web site, and paper.

Appendix V

Use of Illegal Tax Protester and Similar Designations in Case Narratives by Internal Revenue Service Employees During Fiscal Years 2003, 2004, and 2005

| Exception Location | Fiscal Year 2003 Review | | | Fiscal Year 2004 Review | | | Fiscal Year 2005 Review | | |
|---|---|---|---|---|---|---|---|---|---|
| | Employees | Protester Use | Similar Designation Use | Employees | Protester Use | Similar Designation Use | Employees | Protester Use | Similar Designation Use |
| Appeals Centralized Database System (ACDS) | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| Automated Collection System (ACS) | 77 | 66 | 17 | 41 | 31 | 13 | 44 | 38 | 11 |
| Criminal Investigation Management Information System (CIMIS) | 0 | 0 | 0 | 5 | 2 | 3 | 3 | 0 | 3 |

Appendix VI

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Integrated Collection System (ICS) | 209 | 93 | 135 | 153 | 76 | 101 | 187 | 95 | 119 |
| Taxpayer Advocate Management Information System (TAMIS) | 4 | 0 | 4 | 4 | 3 | 1 | 2 | 0 | 2 |
| Taxpayer Information File (TIF) | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 36 | 4 |
| TOTALS | 292 | 159 | 158 | 203 | 112 | 118 | 272 | 169 | 140 |

Source: Various Internal Revenue Service case narratives and Treasury Inspector General for Tax Administration reports entitled Fiscal Year 2003 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Reference Number 2003-40-098, dated April 2003) and Fiscal Year 2004 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations (Reference Number 2004-40-109, dated June 2004).

During our Fiscal Year 2005 review, we searched for the following words and abbreviations to identify Illegal Tax Protester (ITP) and other similar designations being used by Internal Revenue Service (IRS) employees in their case narratives. We did not take exception to employee comments quoting a taxpayer's self-designation as an ITP.

## Examples of Illegal Tax Protester and Similar Designations Found in Case Narratives

| | | | |
|---|---|---|---|
| • CHALLENGE | • CHLLNG | • CNSTTTNL | • CONGRESSIONAL |
| • CONSTITUTIONAL | • ITP | • OBJECTOR | • PROTESTER |
| • PROTESTOR | • PROTESTR | • PROTSTR | • PRTSTR |

The following comments made by employees are a few examples of ITP and similar designations found in IRS employees' case narratives.

• THIS TP [taxpayer] IS A TAX PROTESTER.

• HERE WE HAVE A LONG TIME COMPLIANCE CHALLENGED NON-TAXPAYER WHO HAS A 15 YEAR RECORD OF NOT PAYING [gender removed] TAXES.

• TP [taxpayer] IS A NON COMPLIANCE FILER AKA [also known as] IN THE OLD DAYS AS A TAX PROTESTOR.

• IT IS CLEAR THAT TP [taxpayer] IS A TAX PROTESTOR ALTHOUGH [gender removed] STATES IN [gender removed] LETTER THAT [gender removed] IS NOT.

• NOW I SEE THE PROTESTOR BEGINNING TO COME OUT.

• MR. & [and] MRS. [name removed] HAVE NOT BEEN COOPERATIVE TAXPAYERS AND ARE IDENTIFIED AS "CONSTITUTIONALLY CHALLENGED". [sic]

• TP IS "CONSTITUTIONALLY CHALLENGED" OR WHATEVER WE ARE CALLING THEM NOWADAYS.

• SINCE TP [taxpayer] IS A TAX PROTESTOR DO NOT WANT TO GIVE [gender removed] APPEAL RIGHTS TWICE.

Fiscal Year 2005 Statutory Audit of Compliance With Legal Guidelines Prohibiting the Use of Illegal Tax Protester and Similar Designations

- TAXPAYER SEEMS NOT TO BELIEVE IN TAXATION. TP [taxpayer] MAY BE A TAX COMPLIANCE CHALLENGED TAXPAYER.

- TP [taxpayer] VERY NASTY PROTESTER.

## Management's Response to the Draft Report

The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

**Appendix VII**

This is the cached copy of http://www.treas.gov/tigta/auditreports/2004reports/200430094fr.html.

# Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are Issued

## April 2004

## Reference Number:Â  2004-30-094

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

April 29, 2004

MEMORANDUM FOR COMMISSIONER, SMALL BUSINESS/ SELF-EMPLOYED DIVISION

FROM:Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  *(for)*Â Â Â  Gordon C. Milbourn III /s/ Margaret E. Begg

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Acting Deputy Inspector General for **Audit**

 SUBJECT:Â Â Â Â  Final **Audit** Report - Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are IssuedÂ (**Audit** # 200330031)

This report presents the results of our review to determine whether the Internal Revenue Service (IRS) has complied with 26 United States Code (U.S.C.) Section (Â§) 6330, Notice and Opportunity for Hearing Before Levy.Â  The IRS Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to notify taxpayers at least 30 days before initiating any levy action, to give taxpayers an opportunity to formally appeal the proposed levy.Â  Specifically, we determined whether the IRS has sufficient controls in

**Exhibit B 3**

place to ensure taxpayers are advised of their right to a hearing at least 30 days prior to levy action. This is the sixth annual report the Treasury Inspector General for Tax Administration (TIGTA) has issued in compliance with the RRA 98 to determine whether the IRS is complying with legal guidelines over the issuance of levies.

Prior TIGTA reports have recognized that the IRS has implemented tighter controls over the issuance of systemically generated levies. This was due primarily to the development of systemic controls in both the Automated Collection System and Integrated Collection System (ICS) to prevent a levy from being generated unless there were at least 30 days between the date taxpayers received notice of their appeal rights and the date of the proposed levy. Our testing of these controls indicated that they continue to function effectively.

However, last year's report also discussed the fact that revenue officers sometimes issued manual levies to taxpayers who were not properly notified of their appeal rights. We recommended the IRS require managers to review and approve all manual levies prepared by revenue officers in order to ensure taxpayers are properly advised of their appeal rights. The IRS declined to implement this recommendation but did issue a memorandum on June 20, 2003, reminding revenue officers that proper notification must be given to a taxpayer before a manual levy is issued. Our review of manual levies issued between July 1 and October 31, 2003, indicated that this corrective action was not effective. Revenue officers are still not always properly notifying taxpayers of their appeal rights. Specifically, in 5 of 40 cases reviewed, we determined that revenue officers issued manual levies to seize the assets of taxpayers who had not been notified of their appeal rights. We recommended the Commissioner, Small Business/Self-Employed Division, reconsider requiring managers to review all manual levies prepared by a revenue officer.

Management's Response: While IRS management agreed that taxpayers' rights must be protected, they did not agree with our recommendation to have group managers approve all manual levies prepared by revenue officers. They expressed concern about the impact on field employees that further increasing the oversight of enforcement action could have. IRS management also indicated they believe the errors evidence a training issue.

To help address these concerns and reinforce the existing procedures, the IRS issued an ICS Alert on March 5, 2004. This Alert reminded employees to ensure taxpayer rights are protected whenever a manual levy is issued. Management's complete response to the draft report is included as Appendix V.

Office of **Audit** Comment: We recognize the IRS' caution in implementing any managerial action it believes may inhibit effective enforcement action by revenue officers.

Â  However, we also recognize the importance of the RRA 98 provision requiring that taxpayers be properly advised of their appeal rights prior to asset seizure through levy action.Â  We hope the IRSâ€™ issuance of the ICS Alert reminding revenue officers that all notice requirements must be satisfied before a manual levy is issued will suffice to ensure taxpayer rights are adequately safeguarded.Â  While we still believe our recommendation is worthwhile, we do not intend to elevate our disagreement concerning it to the Department of the Treasury for resolution.Â  We will continue to closely monitor this issue during future mandatory reviews of the IRSâ€™ collection activities.

Copies of this report are also being sent to IRS managers affected by the report recommendation.Â  Please contact me at (202) 622-6510 if you have questions or Parker Pearson, Acting Assistant Inspector General for **Audit** (Small Business and Corporate Programs), at (410) 962-9637.

## Table of Contents

Background

Controls Implemented to Protect Taxpayer Rights During the Issuance of Systemic Levies Are Operating Effectively

Revenue Officers Are Still Issuing Some Manual Levies Without Properly Notifying Taxpayers of Their Appeal Rights

     Recommendation 1:

Appendix I â€" Detailed Objective, Scope, and Methodology

Appendix II â€" Major Contributors to This Report

Appendix III â€" Report Distribution List

Appendix IV â€" Outcome Measures

Appendix V â€" Managementâ€™s Response to the Draft Report

## Background

When taxpayers refuse to pay delinquent taxes, the Internal Revenue Service (IRS) has authority to work directly with financial institutions and other third parties to seize taxpayersâ€™ assets.

Â  This action is commonly referred to as a â€œlevy.â€•Â  The IRS Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to notify taxpayers at least 30 days before initiating a levy action, to give taxpayers an opportunity to formally appeal the proposed levy.

The RRA 98 also requires the Treasury Inspector General for Tax Administration (TIGTA) to annually verify whether the IRS is complying with the new provisions.Â  This is the sixth year that the TIGTA has evaluated the controls over levies.

Two operations within the IRS issue levies to collect delinquent taxes:

℟• The Automated Collection System (ACS), where Customer Service Representatives (CSR) contact delinquent taxpayers by telephone to collect unpaid taxes and secure tax returns.

℟• The Collection Field function (CFf), where revenue officers contact delinquent taxpayers in person as the final step in the collection process.Â  Field contact becomes necessary when the ACS does not resolve the tax matter.Â  Delinquent cases that are assigned to revenue officers in the IRS field offices are controlled and monitored with the Integrated Collection System (ICS).

Both operations issue two types of levies:Â  systemically generated levies and manual levies.Â  Previous TIGTA reports have recognized the IRS has significantly improved controls over the issuance of systemically generated levies.Â  However, the TIGTAâ€™s June 2003 report did identify that additional controls are needed over manual levies issued by revenue officers.

This review was conducted at the Small Business/Self-Employed (SB/SE) Division Headquarters in New Carrollton, Maryland, and at Compliance Area 3 and 11 Offices, headquartered in Philadelphia, Pennsylvania, and Denver, Colorado, respectively.Â  We conducted the **audit** from October 2003 through February 2004 in accordance with *Government Auditing Standards.*

Detailed information on our **audit** objective, scope, and methodology is presented in Appendix I. Â  Major contributors to the report are listed in Appendix II.

## Controls Implemented to Protect Taxpayer Rights During the Issuance of Systemic Levies Are Operating Effectively Â

Systemic controls in both the ACS and ICS are effective to ensure taxpayers receive timely notification of their appeal rights.

### ACS controls

The first step in the collection process involves mailing taxpayers a series of notices asking for payment of delinquent taxes.Â  If taxpayers do not comply, the majority of the accounts are forwarded to an ACS Call Center where CSRs contact taxpayers by telephone to resolve their accounts.Â  If accounts cannot be resolved, CSRs have the authority to issue levies.

Virtually all levies issued by CSRs are generated through the ACSâ€™ automated system. Â This automated system contains a control, developed to comply with the RRA 98, that compares the date the taxpayer was notified of the pending levy with the date requested for the actual levy. Â If there are fewer than 30 days between the dates, the system will not generate a levy. Â This control is designed to ensure taxpayers have been notified at least 30 days prior to the levy and have been informed of their appeal rights for any systemically generated levy.

We tested the effectiveness of this control by reviewing a random sample of 30 systemically generated levies issued by the ACS between July 1 and October 31, 2003. Â All 30 taxpayers were timely notified of their appeal rights. Â During fieldwork, we also tested the control by requesting a levy on a live case for which fewer than 30 days had elapsed since the final notice date. Â The system would not issue the levy. Â Based on these results, we concluded that the systemic controls over levies issued in the ACS Call Centers effectively protect taxpayersâ€™ appeal rights.

## ICS controls

Many times, notices and telephone calls to taxpayers do not successfully resolve delinquent accounts, and cases have to be assigned to revenue officers in CFf offices for face-to-face contact with taxpayers. Â Cases assigned to revenue officers are controlled on the ICS. Â Revenue officers use the ICS to record collection activity on delinquent cases and generate certain enforcement actions such as levies.

The IRS installed a control in the ICS similar to the control in the ACS that prevents a levy from being issued unless taxpayers have received 30 days notice and been informed of their appeal rights. Â If fewer than 30 days have elapsed since the final notice date, the system will not generate a levy.

We tested the effectiveness of this systemic control by reviewing a random sample of 30 ICS cases that had levies issued between July 1 and October 31, 2003. Â All 30 of the taxpayers had received notification of their appeal rights at least 30 days prior to the levy. Â Next, we tested the control by attempting to generate a levy on a live case for which fewer than 30 days had elapsed since the final notice date. Â The system would not issue the levy. Â

Finally, we tested another systemic control by attempting to alter a critical date in the ICS history section. Â We could not alter the date to generate the levy. Â Based on these results, we concluded that the systemic controls over levies issued by revenue officers in CFf offices effectively protect taxpayersâ€™ appeal rights.

While the IRS has done an effective job of implementing controls over systemic levies generated by the ACS and ICS, additional controls are needed over manual levies issued by revenue officers.

## Revenue Officers Are Still Issuing Some Manual Levies Without Properly Notifying Taxpayers of Their Appeal Rights

The second type of levy that both CSRs and revenue officers can issue is the manual levy. Â That is, the levy is issued outside of the ACS and ICS automated processes and is not subject to the systemic controls.

Because manual levies are issued outside of the ACS and ICS automated processes, an automated **audit** trail for these actions is not produced. Â Therefore, it is impossible to reliably determine the exact number of manual levies that were issued by either CSRs or revenue officers during our review period. Â IRS management did inform us that they believe manual levies are issued infrequently.

Although the ACS CSRs primarily issue levies systemically, they also issue manual levies under certain circumstances, such as levies on Individual Retirement Accounts and jeopardy situations. Â Manual levies require the same advance notification of the taxpayer as systemic levies except in cases involving jeopardy situations. Â IRS procedures require that manual levies issued by CSRs be reviewed and approved by a manager prior to the levy being issued. Â We consider this managerial review to be a strong control.

Revenue officers similarly issue levies systemically, in most cases, through the ICS. Â They are also authorized to issue a manual levy on any case as needed. Â While managerial approval is mandatory for manual levies issued by ACS employees, no review or approval is required when revenue officers issue a manual levy. Â

We believe there is a high risk associated with these manual levies because the IRS has not implemented any controls to ensure taxpayersâ€™ appeal rights are protected as required by the RRA 98. Â Our June 2003 report discussed the fact that revenue officers sometimes issued manual levies to taxpayers who were not properly notified of their appeal rights. Â We recommended the IRS require managers to review and approve all manual levies prepared by revenue officers in order to ensure taxpayers are properly advised of their appeal rights. Â The IRS declined to implement this recommendation because it believed it would impede prompt enforcement action. Â The IRS did issue a memorandum on June 20, 2003, reminding revenue officers that proper notification must be given to a taxpayer before a manual levy is issued.

We analyzed the ICS case inventory assigned to revenue officers to identify any manual levies issued between July 1 and October 31, 2003. Â Because there is no automated **audit** trail produced for manual levies, we analyzed case history comments for any references to a manual levy. Â Using this methodology, we identified 40 cases in which a manual levy was issued to seize taxpayersâ€™ assets. Â In 5 of the 40 cases, the revenue officer did not properly notify the taxpayers of their appeal rights before issuing the manual levies. Â None of the five manual levies involved jeopardy situations. Â Because of the imprecise nature of revenue officer case history entries, there could have been significantly more manual levies issued during our review period than the 40 we identified.

Not offering appeal rights to taxpayers prior to issuing levies is a potential Section 1203 violation of the RRA 98 and could result in the revenue officer being terminated for misconduct. We have referred the five cases to the TIGTA Office of Investigations for further evaluation.

## Recommendation

1.  The Commissioner, SB/SE Division, should reconsider developing and implementing controls over manual levies issued by revenue officers working in the IRS field offices to ensure taxpayers are properly offered their appeal rights. At a minimum, the Commissioner, SB/SE Division, should require that manual levies be reviewed and approved by a manager. This would help ensure the 30•day requirement has been met before levy action.

Management's Response: While IRS management agreed that taxpayers' rights must be protected, they did not agree with our recommendation to have group managers approve all manual levies prepared by revenue officers. They expressed concern about the impact on field employees that further increasing the oversight of enforcement action could have. IRS management also indicated they believe the errors evidence a training issue.

To help address these concerns and reinforce the existing procedures, the IRS issued an ICS Alert on March 5, 2004. The Alert reminded employees to ensure taxpayer rights are protected whenever a manual levy is issued. It also included a reminder that the final notice issued by the campuses does not contain the appropriate due process notification.

Office of Audit Comment: We recognize the IRS' caution in implementing any managerial action it believes may inhibit effective enforcement action by revenue officers. However, we also recognize the importance of the RRA 98 provision requiring that taxpayers be properly advised of their appeal rights prior to asset seizure through levy action. We hope the IRS' issuance of the ICS Alert reminding revenue officers that all notice requirements must be satisfied before a manual levy is issued will suffice to ensure taxpayer rights are adequately safeguarded. We will continue to closely monitor this issue during future mandatory reviews of the IRS' collection activities.

**Appendix I**

## Detailed Objective, Scope, and Methodology

The overall objective of this review was to determine whether the Internal Revenue Service (IRS) has complied with 26 United States Code (U.S.C.) Section (§) 6330, Notice and Opportunity for Hearing Before Levy. To accomplish our objective, we:

I.       Determined whether the IRS was maintaining sufficient automated controls and

procedures to ensure taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action.

A.  Performed a walk-through of two Automated Collection System (ACS) Call Centers and four Collection Field function offices and evaluated procedures and controls over due process notices.

B.  Tested whether systemic controls in the ACS and the Integrated Collection System (ICS) were preventing levies from being issued in fewer than 30 days from the final notice date.

C.  Tested whether IRS employees could modify the final notice date in the ACS and ICS.

D.  Selected a random sample of 30 ICS levies from the population of 110,670 levies issued between July 1 and October 31, 2003, from the ICS database of open cases. We analyzed Master File transcripts and the ICS record history for the sample cases selected and verified whether taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action. We did not use statistical sampling because, based on prior years' testing, we did not anticipate finding any errors; consequently, we would not need to project our results.

E.  Selected a random sample of 30 ACS levies from the population of 510,288 levies issued between July 1 and October 31, 2003, from the ACS database of open cases. We analyzed Master File transcripts and the ACS record history for the sample cases selected and verified whether taxpayers had been advised of their right to a hearing at least 30 days prior to any levy action. We did not use statistical sampling because, based on prior years' testing, we did not anticipate finding any errors; consequently, we would not need to project our results.

II.    Determined whether manual levies issued by revenue officers complied with legal guidelines in 26 U.S.C. § 6330.

A.  Identified any references to manual levies issued between July 1 and October 31, 2003, by querying the narrative history text field of the ICS open case inventory. We identified a population of 40 manual levies that were issued during our review period and included all of them in our review.

1.  Requested complete case history files (history query) for all cases containing references to manual levies identified in step II.A.

2.  Reviewed case history documentation and identified whether a revenue officer had issued a manual levy.

3.  Analyzed Master File transcripts and ICS history files to determine whether

taxpayers were provided at least 30 days notice prior to any levy action initiated by the IRS.

**Appendix II**

## <u>Major Contributors to This Report</u>

Parker F. Pearson, Acting Assistant Inspector General for **Audit** (Small Business and Corporate Programs)
Richard Dagliolo, Director
Anthony J. Choma, **Audit** Manager
Cynthia Dozier, Senior Auditor
Mildred Rita Woody, Senior Auditor
Seth Siegel, Auditor

**Appendix III**

## <u>Report Distribution List</u>

CommissionerÂ  C
Office of the Commissioner â€" Attn:Â  Chief of StaffÂ  C
Deputy Commissioner for Services and EnforcementÂ  SE
Commissioner, Wage and Investment DivisionÂ  SE:W
Acting Deputy Commissioner, Small Business/Self-Employed DivisionÂ  SE:S
Deputy Commissioner, Wage and Investment DivisionÂ  SE:W
Acting Director, Compliance, Small Business/Self-Employed DivisionÂ  SE:S:C
Director, Compliance, Wage and Investment DivisionÂ  SE:W:CP
Director, Strategy and Finance, Wage and Investment DivisionÂ  SE:W:S
Chief CounselÂ  CC
National Taxpayer AdvocateÂ  TA
Director, Office of Legislative AffairsÂ  CL:LA
Director, Office of Program Evaluation and Risk AnalysisÂ  RAS:O
Office of Management ControlsÂ  OS:CFO:AR:M
**Audit** Liaisons:
Â Â Â Â Â Â Â Â Â Â  Commissioner, Small Business/Self-Employed DivisionÂ  SE:S
Commissioner, Wage and Investment DivisionÂ  SE:W

**Appendix IV**

Additional Efforts Are Needed to Ensure Taxpayer Rights Are Protected When Manual Levies Are Issued

## Outcome Measures

This appendix presents detailed information on the measurable impact that our recommended corrective action will have on tax administration.Â  This benefit will be incorporated into our Semiannual Report to the Congress.

### Type and Value of Outcome Measure:

ℜ•    Taxpayer Rights and Entitlements â€" Actual; five taxpayers did not receive notice of their appeal rights before the Internal Revenue Service (IRS) took levy action (see page 4).

### Methodology Used to Measure the Reported Benefit:

We analyzed (using computerized queries) the Integrated Collection System case inventory of delinquent taxpayers assigned to revenue officers and identified 40 manual levies issued between July 1 and October 31, 2003.Â  Since the IRS does not monitor or record the use of manual levies, we were unable to determine the total number of manual levies actually issued by revenue officers working in field offices.Â  Because the population of manual levies is unknown, the findings of our case review cannot be projected.

**Appendix V**

## Managementâ ™s Response to the Draft Report

*The response was removed due to its size.Â  To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.*

# JOINT HEARING BEFORE THE COMMITTEES OF THE

# UNITED STATES SENATE

# AND

# UNITED STATES HOUSE OF REPRESENTATIVES

# MAY 20, 2003



## "The Strategic Plans and Budget of the IRS"

## STATEMENT FOR THE RECORD

## Pamela J. Gardiner

# Exhibit B 4

Testimony 05-20-2003

# Acting Inspector General
# Treasury Inspector General for Tax Administration

Mr. Chairman and Members of the Committees, I appreciate the opportunity to appear before you today to discuss the challenges and vulnerabilities the Internal Revenue Service (IRS) continues to face in improving the economy, efficiency, and effectiveness of tax administration. My comments will also address the IRS' compliance with the IRS Restructuring and Reform Act of 1998 (RRA 98).

Three years ago when the former Treasury Inspector General for Tax Administration (TIGTA) appeared before you and reported on the IRS' progress in implementing the RRA 98 provisions, the IRS was in the midst of a significant business restructuring. The IRS was reorganizing itself into four operating divisions to have end-to-end responsibility for defined groups of taxpayers with similar characteristics. Key business systems modernization initiatives were underway to redesign the IRS' outdated computer systems, and management was improving the organization's customer service operations to better serve and communicate with taxpayers. As of today, while the IRS has revamped some of its business processes and practices, progress has been slow in implementing critical improvements to IRS operations to provide world-class service to taxpayers.

With the appointment of a new IRS Commissioner and the expected departures of key executives, the IRS is also encountering tremendous leadership changes.    The new Commissioner is challenged with continuing the IRS' reinvention efforts in modernizing its computer systems, protecting taxpayer rights and privacy, and ensuring tax law compliance and enforcement while providing improved customer service. In addition to turnover in the top IRS management positions, there are also membership changes on the IRS Oversight Board that could impact the direction of ongoing IRS initiatives.

In this environment, TIGTA continues to devote its efforts to provide useful, balanced information to IRS management and other decision-makers. TIGTA audit coverage focuses on the management and performance challenges facing the IRS. We are providing critical information on the IRS' operational and programmatic issues such as business systems modernization (BSM), tax compliance, computer and physical security, performance and financial management, customer service, returns processing, and the filing season. In order to safeguard the IRS' ability to collect revenue and combat fraud, waste, and abuse, TIGTA's investigative work is centered on:

➢ IRS employee integrity.

➢ IRS employee and infrastructure security.

➢ External attempts to corrupt federal tax administration.

As a result of our audit and investigative work, I believe the following issues are the most

significant challenges facing the IRS.

## Information Systems Security

After September 11, 2001, the IRS and TIGTA's Office of Investigations took significant actions to protect IRS employees, facilities, and computer data infrastructure from the threat of terrorism. The process that TIGTA established to share information with the IRS about potential terrorist threats was very positively evaluated in an October 2002 General Accounting Office (GAO) audit report entitled, *IRS and Terrorist Related Information Sharing* (GAO-03-50R).

The IRS has developed adequate security policies and procedures but has not implemented them effectively. As a result, sensitive information remains vulnerable to attack by hackers, terrorists, and disgruntled employees and contractors. While recognizing that total security can never be achieved and that there are necessary trade-offs between security and operational needs, TIGTA continues to identify significant weaknesses in infrastructure and applications security.

TIGTA attributes many of the IRS' security problems to misplaced accountability. As we reported last year, the IRS does not hold its business unit (functional) managers accountable for the security of their systems. Instead, the Office of Security Services took primary responsibility for this function. As a result, functional managers did not annually assess the security of their systems, as required by both the Office of Management and Budget Circular A-130, *Management of Federal Information Resources,* and the *Federal Information Security Management Act.* Significant effort will be required to transfer primary responsibility for systems security from the Office of Security to business unit managers. In addition, attention is needed to enhance the security awareness of IRS managers and employees, and employees with key security responsibilities must be better trained.

## Business Systems Modernization

The IRS' goal of providing efficient and responsive information services to its operating divisions is heavily dependent on modernizing its core computer systems while maintaining the existing systems. Since 2001, the BSM Program has been deploying projects and learning valuable lessons that should help improve future projects. Deployed projects have included an upgraded IRS toll-free telephone system to provide capacity to route taxpayers' calls to the appropriate IRS employee; an Internet application that allows taxpayers to check the status of their returns and refunds; and portions of an IRS-wide secure technology environment and a system designed to improve the availability and performance of modernized systems. The IRS also released an update to its Enterprise Architecture that serves as the roadmap for current and future modernization projects. However, the most significant and complex projects have yet to be delivered.

One of these projects, the Customer Account Data Engine or CADE, will eventually replace the existing Master File of taxpayer accounts. The Master File is the IRS' database that stores various types of taxpayer account information and includes individual, business, and employee plans and exempt organizations data. Therefore, CADE will be the foundation for managing taxpayer

Testimony 05-20-2003

accounts in the IRS' modernization plan. CADE will consist of databases and related applications that will include processes for daily posting, settlement, refund processing, and issue detection for taxpayer account and return data.

The CADE databases and related applications will also enable the implementation of other modernized systems that will improve customer service and compliance and allow the on-line posting and updating of taxpayer account and return data. The portion of the CADE related to individual tax accounts will be incrementally deployed in five releases, each related to a specific taxpayer segment, over several years.

| | RELEASE ONE | RELEASE TWO | RELEASE THREE | RELEASE FOUR | RELEASE FIVE |
|---|---|---|---|---|---|
| **Tax Return Types** | 1040EZ | 1040EZ<br>1040A<br>1040 (without Sch. C,E,F) | 1040EZ<br>1040A<br>1040 (without Sch. C,E,F) | 1040 with Sch. C,E, F,<br>[1]<br>94X<br>[2]<br>720 | All remaining individual tax returns |
| **Filing Status** | Single | All (Single, Married, Head of Household) | All | All | All |
| **Account Characteristics** | Refund or even balance<br><br>No open account issues | Refund or even balance<br><br>No open account issues | Full paid, refund or balance due<br><br>No open account issues | Full paid, refund or balance due<br><br>No open account issues | All accounts not included in previous releases |
| **[3]<br>Est. Returns** | 6 Million | 29 Million | 41 Million | 34 Million | 12 Million |
| **Est. Delivery** | | | | | |
| **As of April 2000** | January 2002 | August 2002 | July 2003 | July 2004 | July 2005 |
| **As of March 2001** | January 2002 | January 2003 | January 2004 | January 2005 | January 2006 |
| **As of April 2003** | August 2003 | January 2005 | TBD | TBD | TBD |

The IRS and its contractor (PRIME) have made progress in delivering the CADE project by building a substantial portion of Release I and creating a comprehensive foundation for all five releases. However, the contractor's development of the CADE project has experienced significant delays and increased costs. As shown in the previous table, the Release 1 deployment date is now estimated to be August 2003, which is about 20 months behind its planned delivery date.

The IRS and PRIME contractor initially estimated that Release 1 could be delivered for approximately $51.9 million, an estimate that was revised 6 months later to $64.6 million. The IRS and PRIME contractor have agreed to cap the Release 1 development costs at $54.5 million. Project delays can be attributed to underestimating the complexity of this effort and difficulties in identifying and managing the project requirements. Specifically, these difficulties occurred in developing the balancing, control, and reconciliation process; comprehensive documentation for the CADE Computer Operations Handbook; computer system naming standards, and testing

activities.

As a result of delays in deploying the CADE, approximately 35 million taxpayers did not receive the benefits of faster tax return processing, and thus faster refunds, during the 2002 and 2003 Filing Seasons. In addition, the modernization projects that will provide improved customer service and compliance activities will be delayed because they are dependent upon CADE. Based on current schedules, these customer service and compliance improvement projects will not be deployed until at least Fiscal Year (FY) 2006 or later. Delays in these projects will have the following adverse effects on the IRS and taxpayers:

➢ The time it takes the IRS to initiate a compliance contact with a taxpayer will not be reduced.

➢ The IRS' ability to offer one-stop service to taxpayers by allowing Customer Service Representatives to identify all issues a taxpayer might have with the IRS when a contact is initiated will be delayed.

➢ The IRS' ability to answer taxpayer account-related questions with timely and complete data will be limited.

Customer Service

RRA 98 mandated that IRS be more responsive to customer needs. To refocus its emphasis on helping taxpayers understand and meet their tax responsibilities, the IRS revised its mission statement. The IRS has made some progress in enhancing its customer service activities. For example, taxpayers have several options from which to choose when they need assistance from the IRS in answering tax law questions. These options include walk-in service at nationwide Taxpayer Assistance Centers (TAC) and toll-free telephone assistance.

During this calendar year, TIGTA assessed the service provided by representatives at the TACs and through the Toll-Free Telephone System. Overall, the IRS has made improvements in providing service to the taxpaying public. For example, during January through April 2003, IRS employees correctly answered 25 percent more questions, provided 19 percent fewer incorrect answers, and referred 87 percent fewer taxpayers to publications than for this same period last year.

During our review of the TACs, TIGTA personnel visited 72 centers and posed 283 questions to IRS representatives. Results of our review are synopsized in the following chart:

|  | Number of Responses | Percentage |
|---|---|---|

Testimony 05-20-2003

| Correct Answers | 199 | 70 |
|---|---|---|
| Incorrect Answers | 73 | 26 |
| No Answer Provided – Referred to Publication In Lieu of a Response | 8 | 3 |
| Other | 3 | 1 |

In January 2003, TIGTA also began assessing whether IRS employees were adhering to operating guidelines by referring the tax law questions we asked, which were outside the scope of services they have been trained to answer. The auditors asked 157 "out of scope" questions and determined that employees did not follow referral procedures for 105 (67 percent) of these questions.

The IRS' accuracy in responding to taxpayers' questions using the IRS' Toll-Free Telephone System was somewhat better than that at the TACs. Between January 27 and March 13, 2003, our reviewers performed on-line monitoring of 259 taxpayers calls and determined that IRS representatives correctly answered the taxpayers' questions in 71 percent of the cases.

<u>Filing Season</u>

The tax return filing season impacts every American taxpayer and is, therefore, always a highly critical program for the IRS. In addition to providing customer service to American taxpayers, the IRS must coordinate tax law changes, programs, activities, and resources to effectively plan and manage each filing season.

Overall, the 2003 Filing Season has gone well and tax returns are being processed timely. Based on TIGTA's review, it appears that the IRS should complete processing of individual returns on schedule with all tax refunds being timely issued within the required 45 days from the filing season closing date of April 15. IRS data show that, as of May 9, 2003, over 52 million electronic returns had been received. The official projection for total electronic returns is 54.3 million. Electronic returns have increased by 12 percent from this time last year. In addition, over 69 million paper returns had been received. The official projection for total paper returns is 78 million. Paper returns have decreased by 8 percent from this time last year.

Many new and significant tax law provisions affected taxpayers' Tax Year (TY) 2002 individual income tax returns, including two *Economic Growth and Tax Relief Reconciliation Act of 2001* provisions involving education expenses and retirement savings. These provisions included changes to education savings accounts, qualified tuition programs, and individual retirement arrangements (IRA). In addition, the Act created a new tuition and fees deduction and a new retirement savings contribution credit (also referred to as "saver's credit"). These changes were considered significant because they could affect an estimated 86.5 million taxpayers by providing tax benefits of up to $7.6 billion in FY 2003. Properly implementing such changes required the IRS to reprogram its computer systems to ensure that taxpayers received the tax benefits allowed

by the new provisions.

TIGTA's analysis of IRS computer programming requests to prepare for the filing season showed that the requests were timely submitted and were generally accurate; however, some errors and omissions were identified. For example, computer programming requests to implement the new retirement savings contribution credit and request changes to the IRA deduction contained errors that could have denied credits or deductions to some taxpayers. Also, omissions in computer programming requests may have resulted in the loss of tax revenue by allowing certain taxpayers to receive larger credits or deductions than they were eligible to receive. This possibility exists for the new retirement savings contribution credit, the IRA deduction, and the student loan interest deduction.

## The IRS Restructuring and Reform Act of 1998

Due to the comprehensive nature of this reform law, the IRS has dedicated significant attention and resources toward implementing the RRA 98 provisions. RRA 98 included fundamental changes to tax law procedures and 71 provisions that increase or further protect taxpayers' rights. The IRS has taken several actions to improve compliance with these provisions. For example, in some instances, the IRS added a higher level of managerial review, implemented new computer controls to prevent certain violations from occurring, and provided additional training and guidance to help employees and managers understand the provisions' requirements. TIGTA has reported that the IRS has fully implemented three taxpayer rights provisions - *Mitigation of Failure to Deposit Penalty, Seizure of Property, and Taxpayer Advocate-Hardships*. The IRS is generally compliant with two other provisions – *Illegal Tax Protestor Designation and Collection Due Process for Liens and Levies.*

RRA 98 required TIGTA to review 10 of the 71 taxpayer rights provisions, as well as 2 other taxpayer rights provisions in prior legislation. TIGTA is currently in the fifth review cycle assessing the mandatory RRA 98 provisions. TIGTA's most recent audit results on these taxpayer rights provisions are as follows:

> ➢ *Notice of Levy* – Most levies are computer generated and subjected to systemic controls that effectively ensure that taxpayers are informed of their appeal rights at least 30 days prior to receiving a systemically generated levy. In some circumstances, however, IRS employees must issue manual levies. Though managers approve and review manual levies issued by Automated Collection System employees, manual levies issued by revenue officers are not required to be reviewed and approved by managers. This significantly increases the risk of taxpayers not having their appeal rights properly protected.

> ➢ *Restrictions on the use of enforcement statistics to evaluate employees* – A review of 74 judgmentally sampled enforcement employees' performance and related supervisory documentation prepared between October 1, 2001, and August 31, 2002, revealed no instances of the use of tax enforcement results, production quotas, or goals to evaluate employee performance. There was also improvement over the previous year in documenting

the evaluation of employees on the fair and equitable treatment of taxpayers. In addition, a review of 21 statistically sampled supervisors showed the IRS completed the required consolidated office certification memoranda on whether tax enforcement results were used in a prohibited manner.

➢  *Notice of Lien* – An estimated 14,695 lien notifications, out of a  population of 367,385 lien notices prepared between August 1, 2001, and June 30, 2002, were not mailed to the taxpayer, the taxpayer's spouse, or to the taxpayer's business partners; or were not mailed to the taxpayer's or spouse's last known address.  Taxpayer rights could be affected because the taxpayer who failed to receive a notice or who received a late notice might not be aware of the right to appeal or could have less than the 30-day period allowed by the law to request a hearing.

➢  *Seizures* – TIGTA determined that in a statistical sample of 102 seizures from the 218 seizures conducted by the IRS between October 2001 and June 2002, the IRS complied with legal provisions and internal procedures when seizing taxpayers' property for payment of delinquent taxes.

➢  *Illegal Tax Protestor (ITP) Designations* – The IRS has not reintroduced past ITP codes on the Master File, and formerly coded ITP taxpayer accounts have not been reassigned to a similar ITP designation.  In addition, the IRS does not have any current publications with ITP references.  However, IRS employees continue to make references to taxpayers as ITPs and other similar designations in case narratives.  TIGTA identified 321 taxpayers that were potentially affected due to improper designations.  We have not reported that these taxpayers have been harmed by the designations.  Only a thorough review of each taxpayer's case and the treatment accorded that taxpayer would determine if these taxpayers have been harmed.  In our most recent report on this subject, TIGTA recommended that the IRS review each case where the reference to ITP or similar designation had been identified and make such determinations.

In its response to the draft report, the IRS disagreed with our determination that in order to comply with this provision, IRS employees should not designate taxpayers as ITPs or similar designations in case histories.

➢  *Assessment Statute of Limitations* – Employees properly advised taxpayers of their rights to refuse or restrict the scope of the statute extension in 32 of 48 (67 percent) of the tax returns sampled.  In 16 of 48 (33 percent) of the tax returns sampled, TIGTA could not determine if employees advised taxpayers of their rights because related case files   did not contain a record that taxpayers had been advised of their rights.   In 22 of the 24 (92 percent) jointly filed returns sampled, there was no documentation in the related case files that each taxpayer listed on the return was separately informed of his or her rights (i.e., dual notification).

➢  *Denials of Requests for Information Under the Freedom of Information  Act* – TIGTA identified an estimated 458 responses to Freedom of Information Act or Privacy Act requests

where information was improperly withheld, out of 4,610 requests for information that were denied in whole or part, or where the IRS replied that responsive records were not available. There were also an estimated 1,052 responses to Internal Revenue Code Section 6103 requests where information was improperly withheld, out of an estimated population of 8,612 requests that were denied or partially denied or where requesters were told that records could not be located.

➢ *Collection Due Process* – The IRS substantially complied with the requirements of the law and ensured taxpayers' appeal rights were protected in 85 of 87 (98 percent) appeal cases reviewed. In the remaining 2 cases, TIGTA did not conclude that the noncompliance resulted in a legal violation of the taxpayer's Collection Due Process (CDP) rights since collection actions were not initiated. In addition, approximately 94 percent of the CDP determination letters provided to taxpayers (82 of 87 letters) followed the established IRS guidelines. This was a noticeable improvement over prior audit results when approximately 14 percent of the determination letters were determined deficient.

Neither TIGTA nor the IRS could evaluate the IRS' compliance with the following four provisions since IRS management information systems are not available to track the specific cases:

➢ Restrictions on directly contacting taxpayers instead of authorized representatives.

➢ Taxpayer complaints.

➢ Separated or divorced joint filer requests.

➢ Fair Debt Collection Practices Act (FDCPA) Violations – The IRS does track potential FDCPA violations on its computer systems; however, we determined that data on one system may not always be complete and accurate. Based on information recorded as potential FDCPA violations on the IRS' computer system, TIGTA identified two violations that occurred after July 22, 1998, that resulted in administrative actions being taken against employees. The IRS had no closed cases in which the IRS paid any money to taxpayers for civil actions resulting from FDCPA violations.

## Tax Compliance Efforts

The IRS' goal of providing world-class service to taxpayers hinges on the theory that, if the IRS provides the right mix of education, support, and up-front problem solving to taxpayers, the overall rate of voluntary compliance with the tax laws will increase. The compliance program (examining tax returns and collecting tax liabilities) would then address those taxpayers who purposefully did not comply. The challenge to IRS management is to establish a tax compliance program that identifies those citizens who do not meet their tax obligations, either by not paying the correct amount of tax or not filing proper tax returns.

Enforcement actions against individuals and businesses that purposefully conceal tax liabilities or even refuse to submit tax returns have fallen dramatically, despite concerns that tax cheating

remains at high levels. The following chart exhibits the fact that, since FY 1996, the level of IRS enforcement activities has significantly declined.

| Enforcement Action | Overall Decline FY 1996 – FY 2002 |
|---|---|
| Face-to-Face Audits | 70% |
| Correspondence Audits | 56% |
| Liens | 34% |
| Levies | 79% |
| Seizures | 97% |

The overall decline in enforcement actions has been primarily attributed to a long-term reduction in enforcement staffing, to redirection of resources to customer service functions during the filing season, a decline in direct
examination time, and to IRS employees' concerns over the mandatory termination provision in Section 1203 of RRA 98.

IRS management and many stakeholders have been concerned about the decline in enforcement activities. However, the IRS has not conducted Taxpayer Compliance Measurement Program audits since 1988. Therefore, it currently has no reliable method to measure voluntary compliance or the effect that increased customer service and diversion of compliance resources are having on voluntary compliance. TIGTA believes that the ongoing National Research Program is a much-needed first step for providing the information necessary to gauge compliance levels and direct IRS compliance resources towards areas where attention is most needed.

While the decline in enforcement actions since FY 1996 has been dramatic, there are recent indications that the decline in some categories of enforcement actions and results has stabilized and, in some cases, shown improvement. For example, the IRS' FY 2002 compliance efforts and results were mixed, but showed some continuing positive changes that started in FY 2001. Specifically, the level of compliance activities and the results obtained in many, but not all, Collection areas in FY 2002 showed a continuing increase. The number of examinations of tax returns increased in FY 2002, but the overall percentage of tax returns examined stayed about the same due to increases in the number of tax returns filed. The IRS is taking a number of steps to enhance its compliance programs, including:

➢ Conducting the National Research Program, which is designed to measure the level of

compliance nationwide.
➢ Restructuring many Collection and Examination processes.
➢ Focusing on known compliance problems through programs like the Offshore Voluntary Compliance Initiative and the use of Private Collection Agencies.

## Section 1203 Violations

In addition to our audit responsibilities, RRA 98 charges TIGTA with investigating Section 1203 violations. Section 1203 identifies standards of conduct for IRS employees that are intended to address serious and willful acts of misconduct. Section 1203 requires the Commissioner of Internal Revenue to terminate the employment of any IRS employee found guilty of any 1 of 10 specific acts or omissions. TIGTA's role in investigating these allegations of employee misconduct serves to protect taxpayer rights and assure integrity in IRS operations.

The IRS monitors Section 1203 complaints in its Automated Labor and Employee Relations Tracking System - known by its acronym, "ALERTS." The vast majority of Section 1203 complaints recorded in ALERTS have alleged that an IRS employee violated a provision of the Internal Revenue Manual or the Internal Revenue Code in order to retaliate against or harass another person. The second category, as measured by the number of complaints, involves the employee's understatement of Federal tax liabilities.

The IRS receives and adjudicates numerous Section 1203 allegations where no independent TIGTA investigation is needed. When TIGTA involvement is warranted, our focus is to determine the facts of the situation as well as the intent of the violating employee. An employee's intent is an essential element that must be present for Section 1203 disciplinary action to be taken. As of March 31, 2003, ALERTS indicated that 96 employees have been fired and 202 employees have resigned or retired as a result of TIGTA and IRS investigations. Since the inception of Section 1203, TIGTA and the IRS have received a combined total of 5,605 Section 1203 complaints.

TIGTA and the IRS are working together to continuously improve the process of receiving, investigating, and adjudicating alleged violations of Section 1203. In March 2002, a streamlined process was implemented which, enabled TIGTA to make an early differentiation between those 1203 allegations that are valid and those that are not. As a result, TIGTA has been able to devote its resources to the investigation of bona fide 1203 allegations and other employee misconduct.

Mr. Chairman and Members of the Committees, I appreciate the opportunity to share with you today the more significant challenges that confront the new Commissioner and IRS senior management. Although the IRS has accomplished a great deal since the passage of RRA 98, much more remains to be done. TIGTA will continue its efforts to provide reliable and objective assessments of the IRS' progress in balancing compliance and customer service, and to investigate employee misconduct or external threats that jeopardize the integrity, efficiency, and effectiveness of the nation's tax administration system.

Testimony 05-20-2003

[1]

    The Form 94X family of returns is used by employers to report income and unemployment taxes withheld from employee wages.

[2]

    Form 720 is the Quarterly Federal Excise Tax Return.

[3]

    Estimated tax returns (electronic and paper) based on 1999 statistics.

# Improvements Should Be Made to Better Control and Report Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Information

## September 2001

## Reference Number: 2001-10-188

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

September 26, 2001

MEMORANDUM FOR DIRECTOR, COMMISSIONER'S

COMPLAINT PROCESSING AND ANALYSIS GROUP

DEPUTY INSPECTOR GENERAL FOR INVESTIGATIONS,

TREASURY INSPECTOR GENERAL FOR TAX

ADMINISTRATION

FROM: Pamela J. Gardiner /s/ Pamela J. Gardiner

Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Improvements Should Be Made to Better Control and Report Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Information

This report presents the results of our review and recommendations regarding Section (§) 1203 complaints. The objectives of this review were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) § 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA), and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress.

**Exhibit B 5**

In summary, at the time of our review, management could not locate 9 of 173 sampled RRA 98 § 1203 complaints, and management information systems did not contain current information for 22 of the 173 sampled § 1203 complaints. After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the management information system based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress. Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

We recommended that IRS and TIGTA Office of Investigations management locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located, correct the status for the remaining § 1203 complaints where the information was not current, develop a process to better control § 1203 complaints, and ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

IRS and TIGTA Office of Investigations management agreed with these recommendations. Their comments have been incorporated into the report where appropriate, and the full text of their comments is included as Appendices VI and VII, respectively.

Copies of this report are also being sent to the IRS managers who are affected by the report recommendations. Please contact me at (202) 622-6510 if you have questions or John R. Wright, Acting Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

# Table of Contents

Executive Summary

Objectives and Scope

Background

Results

       Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

Section 1203 Complaint Information Reported in the Semiannual Reports to the Congress Was Not Always Accurate and Did Not Represent All Complaints

Conclusion

Appendix I – Detailed Objectives, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Outcome Measures

Appendix V – Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Provisions Requiring Termination of Employment

Appendix VI – Internal Revenue Service Commissioner's Complaint Processing and Analysis Group's Response to the Draft Report

Appendix VII – Treasury Inspector General for Tax Administration Office of Investigations' Response to the Draft Report

# Executive Summary

The Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 1203 provides the IRS Commissioner with the authority to terminate the employment of IRS employees for certain proven violations committed in connection with the performance of official duties. The IRS Commissioner also has the authority to determine whether mitigating factors exist that weigh against termination. One example of an RRA 98 § 1203 violation is the willful failure to obtain the required approval signatures on documents authorizing the seizure of a taxpayer's property. Employees may appeal the charges of § 1203 misconduct throughout the administrative process. However, once all appeals have been exhausted and the IRS Commissioner makes a final decision that an employee committed one of the § 1203 provisions, the final decision cannot be appealed and the employee is removed from Federal service, as required by the RRA 98. RRA 98 § 1102(a) added Internal Revenue Code § 7803(d)(1)(E) (Supp. IV 1998) to require the Treasury Inspector General for Tax Administration (TIGTA) to annually report to the Congress any termination or mitigation under RRA 98 § 1203.

The objectives of this audit were to determine if RRA 98 § 1203 complaints were properly controlled by the IRS and the TIGTA and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress.

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

# Results

The IRS and the TIGTA Office of Investigations can better ensure that RRA 98 § 1203 complaint information is properly controlled and accurately reported in the TIGTA Semiannual Report to the Congress. In general, complaints referred from one office to another within the TIGTA Office of Investigations, or from one office to another within the IRS, were accounted for and arrived at their final destination. However, at the time of our review, management could not locate 9 of the 173 complaints in our sample, and management information systems did not contain current information for 22 of the 173 complaints in the sample. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the Investigations Management Information System (IMIS) based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress. Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

## Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

For 31 of the 173 complaints in our sample, either the complaints could not be located from information recorded on the computer databases (9 complaints) or the computer databases did not contain current information about the complaints (22 complaints). We projected our findings to the total population of 1,213 open § 1203 complaints on the IRS and TIGTA databases as of September 30, 2000. According to the projection, casework may not have been completed for an estimated 38 complaints (± 1.93 percent) and the computer databases may not contain current information for another 125 complaints (± 4.23 percent). After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints.

## Section 1203 Complaint Information Reported in the Semiannual Reports to the Congress Was Not Always Accurate and Did Not Represent All Complaints

We compared § 1203 complaint information reported in the FY 2000 TIGTA Semiannual Reports to the Congress to § 1203 complaint documentation obtained from the IRS Commissioner's Complaint Processing and Analysis Group (CCPAG) and from the TIGTA Complaint Management Division. Two required § 1203 items were reported incorrectly in one FY 2000 Semiannual Report and five items not required to be reported were overstated in two FY 2000 Semiannual Reports.

## Summary of Recommendations

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

We recommend that IRS CCPAG and TIGTA Office of Investigations management locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located, correct the computer databases for those § 1203 complaints where the information was not current, ensure compliance with existing procedures for processing § 1203 complaints, devise a method to ensure § 1203 complaints can be located in the future, and ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

Management's Response: IRS CCPAG and TIGTA Office of Investigations management agreed with the observations and recommendations in the report. Both offices took immediate action to resolve the remaining complaints we could not locate and to correct the computer databases where the information was not current. In addition, controls will be strengthened to ensure compliance with existing procedures for processing § 1203 complaints and to ensure that § 1203 complaint information is accurately reported in the TIGTA Semiannual Report to the Congress.

IRS and TIGTA management's complete responses to the draft report are included as Appendices VI and VII, respectively.

## Objectives and Scope

The overall objectives of this audit were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA) and if § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress. Audit work was performed in the IRS Commissioner's Complaint Processing and Analysis Group (CCPAG) and the TIGTA Office of Investigations' Complaint Management Division (CMD). The audit was conducted between December 2000 and April 2001 and was performed in accordance with *Government Auditing Standards*.

To accomplish the objectives, we:

- Interviewed IRS CCPAG and TIGTA CMD personnel to determine how complaints are received, controlled, tracked, and eventually reported in the TIGTA Semiannual Report to the Congress.
- Reviewed a statistically valid sample of 173 open § 1203 complaints from the IRS and the TIGTA Office of Investigations databases as of September 30, 2000, to determine if the complaints were properly controlled.
- Reviewed documentation from the IRS CCPAG and the TIGTA CMD to determine the accuracy of the § 1203 complaint information reported in the TIGTA Semiannual Reports to the Congress for the 6-month periods ending March 31, 2000, and September 30, 2000.

Details of the audit objectives, scope, and methodology are presented in Appendix I. Major contributors to this report are listed in Appendix II.

## Background

On July 22, 1998, the President signed the RRA 98 into law. RRA 98 § 1102(a) added Internal Revenue Code (I.R.C.) § 7803(d)(1)(E) (Supp. IV 1998) to require the TIGTA to annually report to the Congress any termination or mitigation under RRA 98 § 1203. Section 1203 provides the IRS Commissioner with the authority to terminate the employment of IRS employees for certain proven violations committed in connection with the performance of their official duties. The IRS Commissioner also has the authority to determine whether mitigating factors exist that weigh against termination. One example of an RRA 98 § 1203 violation is the willful failure to obtain the required approval signatures on documents authorizing the seizure of a taxpayer's property.

IRS employees and taxpayers may submit § 1203 complaints through e-mail, regular mail, telephone, or fax to any office within the IRS or the TIGTA Office of Investigations. Once received, § 1203 complaints may be investigated by either the IRS or the TIGTA Office of Investigations. In most instances, the TIGTA is given the opportunity to review a § 1203 complaint to decide who should conduct the investigation. The following explains the types of § 1203 complaints investigated by the IRS and the TIGTA.

## Complaints that must be referred to the TIGTA

With the exception of potential Equal Employment Opportunity-related complaints and tax-related issues, the following complaints are referred directly and immediately to the TIGTA Office of Investigations:

- Section 1203 complaints related to all managers, Senior Executive Service, Criminal Investigation, or GS-15 employees.
- Section 1203 complaints related to false statements under oath, falsification of documents, assault or battery, confidentiality and disclosure of return information, or threat of audit.

## Complaints that may be referred to the TIGTA

Based on preliminary investigation by the IRS, complaints related to the remaining § 1203 provisions may be referred to the TIGTA Office of Investigations, as follows:

- Section 1203 complaints related to seizures, constitutional rights, or harassment/retaliation, if IRS management determines that a potential § 1203 violation exists and threshold criteria have been met.
- Section 1203 complaints related to discrimination (civil rights), if IRS management determines that a potential § 1203 violation exists and specific criteria have been met.
- Section 1203 complaints related to late filing or the understatement of tax liability, if IRS management determines that a potential § 1203 violation exists and the facts indicate a potential criminal violation.

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

If the TIGTA Office of Investigations declines to conduct an investigation, the complaint is referred to the IRS through the CCPAG. The IRS Commissioner established the CCPAG to enhance the IRS' responsiveness to employee and taxpayer complaints. In October 1999, the CCPAG began receiving and controlling all § 1203 complaints referred from the TIGTA to the IRS.

## Evaluation of § 1203 Complaints

Once the facts are established through an inquiry or investigation, IRS managers, with the assistance of local labor relations specialists and the staff of the Centralized Adjudication Unit (CAU), evaluate the information to determine if a § 1203 violation has occurred. If there is sufficient evidence to support that a § 1203 violation occurred, the employee is given a letter advising that the IRS proposes to remove him or her from Federal service. The employee has a right to respond to this letter orally or in writing. After the employee responds to the letter, a deciding IRS management official determines if the evidence supports the § 1203 violation charge. This factual determination may be reviewed through arbitration or the employee may appeal the charge of § 1203 misconduct to the Merit Systems Protection Board. If the employee's appeal is not successful and the § 1203 violation remains supported, the case is forwarded to the Commissioner's § 1203 Review Board for evaluation.

The Commissioner's § 1203 Review Board evaluates all cases where there is enough evidence to support the § 1203 violation charge and recommends a disciplinary action (either termination or mitigation) for each case. The Review Board only forwards a § 1203 case to the IRS Commissioner if it determines that the Commissioner should consider mitigation. If the Review Board determines that the Commissioner should not consider mitigation, the case is returned to the deciding IRS management official and the employee is removed from Federal service under the authority of the Commissioner, as required by the RRA 98.

Employees have the same rights to appeal a removal action as they did before the enactment of the RRA 98 and may appeal the charges of § 1203 misconduct throughout the administrative process. However, once the IRS Commissioner makes a final judicial or administrative determination that an employee committed one of the § 1203 provisions, the final decision cannot be appealed and the employee is removed from Federal service, as required by the RRA 98.

During the time period covered by our review, the TIGTA Office of Investigations used the Investigations Management Information System (IMIS) to control and track § 1203 complaints. If a complaint involves allegations against more than one IRS employee, the TIGTA tracks each employee as a separate allegation. The IRS uses two computer systems, the Automated Labor and Employee Relations Tracking System (ALERTS) and the Executive Correspondence Management System (ECMS), to control and track § 1203 complaints.

When the RRA 98 became law on July 22, 1998, the IRS and the TIGTA Office of Investigations began developing procedures for the processing of § 1203 complaints. As with any new process, many procedures changed during the beginning stages as each organization determined the best way to jointly

handle these complaints. As a result, the processes and systems for controlling § 1203 complaints evolved as both the IRS and the TIGTA gained experience in implementing the law.

## Results

The IRS and the TIGTA Office of Investigations can better ensure that RRA 98 § 1203 complaint information is properly controlled and accurately reported in the TIGTA Semiannual Report to the Congress. In general, complaints referred from one office to another within the TIGTA Office of Investigations, or from one office to another within the IRS, were accounted for and arrived at their final destination.

However, at the time of our review, management could not locate 9 of the 173 complaints in our sample, and management information systems did not contain current information for 22 of the 173 complaints in the sample. After we brought these issues to the attention of IRS and TIGTA Office of Investigations management, they began taking corrective actions to locate the 9 complaints and update the computer systems for the 22 complaints. We also identified 28 allegations outside of our sample where the § 1203 violation code had been removed from the IMIS based on the procedures in effect prior to June 2000. This resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress.

Additionally, we identified two required § 1203 items that were reported incorrectly in a Fiscal Year (FY) 2000 TIGTA Semiannual Report to the Congress and five items not required to be reported that were overstated in two FY 2000 semiannual reports.

## Section 1203 Complaints Could Not Always Be Located and Management Information Was Not Always Current or Consistent

For 31 of the 173 complaints in our sample, either the complaints could not be located from information recorded on the computer databases (9 complaints) or the computer databases did not contain current information about the complaints (22 complaints). We projected our findings to the total population of 1,213 open § 1203 complaints on the IRS and the TIGTA databases as of September 30, 2000. According to the projection, casework may not have been completed for an estimated 38 complaints (± 1.93 percent) and the computer databases may not contain current information for another 125 complaints (± 4.23 percent).

In addition to reviewing the sample of complaints, we analyzed the IMIS and identified 28 allegations where the § 1203 violation code had been removed from the system, which resulted in information being inconsistently reported in the TIGTA Semiannual Report to the Congress.

### Transfers were not properly controlled for nine complaints

At the time of our review, neither the IRS nor the TIGTA Office of Investigations could locate 9 of the 173 complaints (5 percent) reviewed. Seven of the nine complaints that could not be located were transferred from the TIGTA Office of Investigations to the IRS. As a result, we could not determine if the IRS had completed its investigation for these complaints.

- Five complaints were referred to the IRS according to the IMIS, but neither the IRS nor the TIGTA Office of Investigations could provide us with a copy of the required transmittal form, Complaint Referral Memorandum - Response Required (Form 2070), during the time of our review.
- One complaint was referred using Form 2070, but the TIGTA Office of Investigations did not have a receipted copy of the Form 2070 to show that the complaint reached its final destination. The TIGTA Office of Investigations had referred the complaint to a former IRS Regional Commissioner's office before the CCPAG was established.
- One complaint was referred using Form 2070 and the TIGTA Office of Investigations had a receipted Form 2070, indicating that the CCPAG received the complaint. However, the complaint was not controlled on the ALERTS, which indicates that the complaint may not have been worked.

The two remaining complaints that could not be located were transferred from the CAU to a field Labor Relations office. However, the field Labor Relations offices had no record of receiving the complaints.

Transmittal forms are generally used to help ensure that management maintains control of the documents as they are transferred from one office to another. Use of a transmittal form generally requires the receiving official to acknowledge receipt of the document by sending a signed copy of the form back to the originator. The TIGTA Office of Investigations requires the use of Form 2070 as a transmittal form when transferring complaints.

IRS management does not require the use of a document transmittal when transferring complaints within the IRS. Instead, a cover letter is attached to the complaint and the computer database is updated to show the complaint was transferred. However, with this method of transfer, there is no follow-up to ensure the employee receives the complaint.

One complicating factor that increases the difficulty of tracking complaints as they are transferred between the IRS and the TIGTA Office of Investigations is the lack of a uniform complaint numbering system to identify complaints in both offices that are recorded on different computer systems. Because the IRS and the TIGTA computer systems were not designed to be integrated with each other, each uses a different numbering system to identify complaints. Without a common field to link the computer systems, complaints that are transferred between the IRS and the TIGTA Office of Investigations cannot be systemically tracked between the two organizations.

If § 1203 complaints are not properly controlled, the administrative action required by law may not be taken by the IRS Commissioner. Uncontrolled complaints could also result in § 1203 information being

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

understated in the TIGTA Semiannual Report to the Congress. Additionally, if all actions are not completed on complaints, employees may not have the opportunity to be proven innocent.

## Computer information was not current for 22 complaints

Information contained on the IRS and the TIGTA computer systems was not current for 22 of the 173 complaints (13 percent) in our sample at the time of our review. Generally, for these 22 complaints, the IMIS, the ALERTS, or the ECMS databases either had not been updated to show the most current work on the case or the information had been entered incorrectly. For example, the IMIS database indicated that ten complaints had been referred to the IRS for action, although the IRS had completed action on the complaints and closed them on its databases. For two other complaints, the IMIS database showed the complaints had been sent to the CMD when they had actually been referred to the IRS for action.

The IRS and the TIGTA Office of Investigations rely on accurate management information to document the location of complaints and to report § 1203 information. Complaints are entered onto computer inventory systems when received, and IRS and TIGTA employees are responsible for updating their respective computer systems whenever complaints are referred from one office to another or when the status of a complaint changes. If information is not updated when the status of a complaint changes (i.e., open, closed, referred), the accuracy of the TIGTA Semiannual Report to the Congress could be affected.

## Computer information was not consistent for 28 allegations

The general § 1203 information reported in the semiannual report relies on accurate § 1203 violation code information. However, a comparison of the September 2000 IMIS data with the March 2000 IMIS data identified 28 allegations that were originally coded as § 1203 violations in March, but were no longer coded as § 1203 violations in September. The TIGTA enters all § 1203 allegations received into the IMIS; however, prior to June 2000, TIGTA employees sometimes removed the § 1203 violation code if the allegation did not meet specific § 1203 criteria. We could not determine when the § 1203 violation code for the 28 allegations had been removed, prior to June 2000 or after.

The TIGTA Office of Investigations added procedures in June 2000 to require the retention of the § 1203 violation code on the IMIS as originally entered. For example, the TIGTA uses the § 1203 violation code to determine the number of allegations received involving potential § 1203 violations. However, if the initial investigation shows the charge of § 1203 misconduct is not supported, the TIGTA does not remove the § 1203 violation code from the IMIS. Instead, the TIGTA continues to show the complaint as an *allegation* of § 1203 misconduct on the IMIS and updates the complaint record with the appropriate closing code to show the allegation was not supported.

Consistent treatment of the § 1203 violation code is important because this code is used in reporting information in the TIGTA Semiannual Report to the Congress. Removing the § 1203 violation code from an allegation on the IMIS reduces the total number of allegations received involving potential § 1203 violations reported in the semiannual report. As a result, information was inconsistently reported

in the TIGTA Semiannual Report to the Congress.

## Recommendations

1. IRS CCPAG and TIGTA Office of Investigations management should locate and complete necessary actions for the remaining RRA 98 § 1203 complaints that could not be located and should correct the status for the remaining § 1203 complaints where the information was not current.

   Management's Response: CCPAG and TIGTA Investigations management have either found, or recreated and resolved the remaining complaints that could not be located. They have also updated the remaining complaints where status information was not current.

2. IRS CCPAG and TIGTA Office of Investigations management should develop a process to better control § 1203 complaints. The process should include:

- Using a transmittal form to transfer complaints between the IRS and the TIGTA.
- Acknowledging receipt (via transmittal form) of the complaint by the receiving office (for complaints transferred between the IRS and the TIGTA).
- Following up with the receiving office if receipt of the complaint is not acknowledged (for complaints transferred between the IRS and the TIGTA).
- Following up with the receiving office to ensure the complaint was received (for complaints transferred within the IRS).
- Updating the complaint status on all relevant computer databases when complaints are transferred or closed.
- Exploring the feasibility of capturing a unique complaint number on the IRS and TIGTA databases.

Management's Response: The CCPAG management processes have evolved and they now have an electronic system in place to control the transfer of complaints within the IRS and a manual system to control the transfer of complaints outside the IRS. Both systems provide a verification of receipt, a trail of actions, and a means to follow-up to ensure complaints are not lost. Information is exchanged with the TIGTA Office of Investigations to show actions taken on complaints. Also, the CCPAG decided the use of a common complaint number was not feasible without a common information system.

The TIGTA Office of Investigations has a manual process in place to control the transfer of complaints. Special Agents in Charge (SAC) will be advised, via memorandum, of their responsibilities to verify receipt of any § 1203 complaints forwarded to the IRS. Also, the SACs and the CMD will be advised of the importance of current and accurate information on their management information systems. In addition, a field is available to capture an IRS complaint number, if applicable.

1. TIGTA Office of Investigations management should develop a consistent method for identifying

the number of § 1203 allegations received for reporting in the TIGTA Semiannual Report to the Congress.

<u>Management's Response</u>: Notification will be provided to TIGTA Office of Investigations personnel that once a § 1203 complaint is entered into the management information system, the violation code will only be removed if management has determined the code was placed there in error.

## Section 1203 Complaint Information Reported in the Semiannual Reports to the Congress Was Not Always Accurate and Did Not Represent All Complaints

We compared § 1203 complaint information reported in the FY 2000 TIGTA Semiannual Reports to the Congress to § 1203 complaint documentation obtained from the IRS CCPAG and the TIGTA CMD. Two required items were reported incorrectly in one FY 2000 semiannual report and five items not required to be reported were overstated in two FY 2000 semiannual reports.

The following chart summarizes the § 1203 information reported in the FY 2000 TIGTA Semiannual Reports to the Congress. The information on terminations and mitigated cases is required by the RRA 98; the other information is not required, but represents the actions taken on the § 1203 allegations received by the TIGTA.

## Reported Versus Actual § 1203 Information

|  | Reported | Actual | Overstated/ (Understated) |
|---|---|---|---|
| **April FY 2000 Semiannual Report** | | | |
| <u>Information Required By RRA 98:</u> | | | |
| Terminations | 11 | 11 | 0 |
| Mitigated Cases | 0 | 0 | 0 |
| <u>Other General Information:</u> | | | |
| § 1203 Allegations Received | 369 | 369 | 0 |
| § 1203 Investigations Initiated | 89 | 78 | 11 |
| Open § 1203 Investigations | 65 | 56 | 9 |

| | | | |
|---|---|---|---|
| Closed § 1203 Investigations | 24 | 22 | 2 |
| § 1203 Complaints Referred to the IRS | 213 | 199 | 14 |

**October FY 2000 Semiannual Report**

Information Required By RRA 98:

| | | | |
|---|---|---|---|
| Terminations | 15 | 17 | (2) |
| Mitigated Cases | 1 | 2 | (1) |

Other General Information:

| | | | |
|---|---|---|---|
| § 1203 Allegations Received | 257 | 251 | 6 |
| § 1203 Investigations Initiated | 164 | 164 | 0 |
| Open § 1203 Investigations | 132 | 132 | 0 |
| Closed § 1203 Investigations | 32 | 32 | 0 |
| § 1203 Complaints Referred to the IRS | 108 | 108 | 0 |

*Source: FY 2000 TIGTA Semiannual Reports to the Congress, TIGTA's IMIS database, and documentation from the CCPAG.*

## The numbers of § 1203 terminations and mitigated cases were not always accurately reported by the IRS

We identified all § 1203 cases evaluated by the Commissioner's § 1203 Review Board during FY 2000 and compared the final disciplinary actions recommended by the Review Board (termination or mitigation) with CCPAG Outreach and Policy Support information and with the ALERTS computer data to determine the accuracy of the number of terminations and mitigated cases reported in the FY 2000 TIGTA Semiannual Reports to the Congress. The IRS is responsible for accurately reporting the number of terminations and mitigated cases to the TIGTA for inclusion in the TIGTA Semiannual Report to the Congress.

Based upon incorrect information provided by the IRS, the TIGTA reported 15 terminations and 1 mitigated case in its Semiannual Report to the Congress for the 6-month period ending September 30,

2000. However, there were actually 17 terminations and 2 mitigated cases recorded on the IRS computer systems for this period. I.R.C. § 7803(d)(1)(E) (Supp. IV 1998) requires the TIGTA to annually report to the Congress all terminations or mitigated cases under RRA 98 § 1203.

The IRS tracks all personnel actions on the ALERTS; however, at the time the data was gathered for the semiannual report, the CCPAG Outreach and Policy Support staff did not have direct access to the ALERTS. Instead, the CCPAG staff relied on a "data call" to determine the total number of terminations and mitigated cases to report to the TIGTA Office of Investigations, but did not have access to the computer data to ensure that the numbers were correct and complete. In January 2001, the CCPAG Outreach and Policy Support function was given direct access to this computer data and became solely responsible for tracking the number of terminations and mitigated cases under § 1203. This should prevent the problem from recurring.

## General § 1203 information was not always accurately reported by the Office of Investigations

In addition to reporting the required information on terminations and mitigated cases under § 1203 in its Semiannual Report to the Congress, the TIGTA Office of Investigations also includes general § 1203 information, such as the number of § 1203 allegations received by the TIGTA and the number of § 1203 investigations initiated.

However, five § 1203 items not required to be reported were overstated in two FY 2000 TIGTA Semiannual Reports to the Congress. These overstatements could have been prevented if the § 1203 information had been independently verified prior to issuance of the semiannual reports, in accordance with internal guidelines.

For example, for the 6-month period ending

March 30, 2000, the number of § 1203 investigations initiated was overstated by 11 and the number of § 1203 complaints referred to the IRS was overstated by 14. The inaccuracies for this reporting period occurred because the TIGTA CMD staff who consolidated the § 1203 information did not always use the correct criteria in their calculations.

For the 6-month period ending September 30, 2000, the TIGTA overstated the number of § 1203 allegations received by six. This overstatement occurred because the CMD staff calculated the number of § 1203 allegations received for the entire fiscal year and then subtracted the number of § 1203 allegations reported in the previous 6-month period. This methodology should have worked; however, the § 1203 violation code had been changed for several of the § 1203 allegations reported in the previous 6-month period.

## Reported information did not include the results of all § 1203 complaints

The type of information on § 1203 complaints presented in the TIGTA Semiannual Report to the

Congress complies with the RRA 98 requirements. In addition, the TIGTA Office of Investigations includes general § 1203 information that is not required by the law.

We identified several other types of information that might be useful in presenting a more complete picture of the results of § 1203 complaints, such as the number of:

- Employees under investigation who chose to resign or retire in lieu of termination under § 1203.
- Employees whose removal (termination) during their probationary period was due to a § 1203 violation.
- Employees whose charge of § 1203 misconduct, and subsequent termination, was reversed through an appeal.
- Section 1203 complaints received and investigated within the IRS that do not require TIGTA investigation.

Although this information is not required, it would provide a more complete picture of actions resulting from § 1203 complaints. For example, from July 22, 1998, (the date the RRA 98 was enacted) through March 31, 2001, there were 41 terminations under § 1203. However, there were 93 additional employees during this same period that resigned or retired after § 1203 administrative procedures were initiated. The 93 resignations or retirements were not reported in any TIGTA Semiannual Report to the Congress.

## Recommendations

4. TIGTA CMD management should ensure that the general § 1203 information is verified before it is included in the TIGTA Semiannual Report to the Congress.

   Management's Response: Standard criteria have been developed to extract § 1203 information. In addition, an independent review of the information will be conducted prior to its release.

5. The TIGTA Office of Investigations should consider reporting in the Semiannual Report to the Congress the number of employees who retire or resign in lieu of termination under § 1203, the number of employees who are removed during their probationary period due to a § 1203 violation, the number of employees whose charge of § 1203 misconduct (and subsequent termination) is reversed through an appeal, and the number of § 1203 complaints received and investigated within the IRS that do not require TIGTA investigation.

Until the number of § 1203 complaints received and investigated within the IRS (not requiring TIGTA investigation) can be included in the semiannual report, TIGTA Office of Investigations management should clarify that the § 1203 numbers reported in the TIGTA Semiannual Report to the Congress do not depict the results of all § 1203 violations.

Management's Response: TIGTA Office of Investigations management will consider reporting this information in future Semiannual Reports.

# Conclusion

The IRS and the TIGTA Office of Investigations can better ensure that RRA 98 § 1203 complaint information is properly controlled and accurately reported in the TIGTA Semiannual Report to the Congress. Due to the sensitivity of § 1203 complaints, improvements should be made to ensure that § 1203 complaints are properly controlled when transferred between offices, that complaint information on computer databases is current, and that § 1203 information is verified before being included in the TIGTA Semiannual Report to the Congress.

**Appendix I**

## Detailed Objectives, Scope, and Methodology

The overall objectives of this audit were to determine if Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) Section (§) 1203 complaints were properly controlled by the IRS and the Treasury Inspector General for Tax Administration (TIGTA) and if RRA 98 § 1203 complaint information was accurately reported in the TIGTA Semiannual Report to the Congress. We performed the following work:

I. Determined if § 1203 complaints were properly controlled by the IRS and the TIGTA Office of Investigations.
   A. Interviewed IRS Commissioner's Complaint Processing and Analysis Group (CCPAG) personnel to determine how complaints are received, controlled, and tracked. Performed a walk-through of the CCPAG and prepared a flowchart of the process.
   B. Interviewed TIGTA Complaint Management Division (CMD) personnel to determine how complaints are received, controlled, and tracked. Performed a walk-through of the CMD and prepared a flowchart of the process.
   C. Obtained an extract of the TIGTA Investigations Management Information System (IMIS) as of September 30, 2000, and requested all § 1203 records from the IRS' Automated Labor and Employee Relations Tracking System (ALERTS) and the Executive Correspondence Management System (ECMS) as of September 30, 2000. Identified 211 § 1203 complaints on the IMIS in the status "referred to the IRS" and 36 § 1203 complaints on the ALERTS or the ECMS in the status "referred to the TIGTA" as of September 30, 2000.
   D. Identified 321 open § 1203 complaints on the IMIS and 645 open § 1203 complaints on the ALERTS or the ECMS that were in a "non-referred" status as of September 30, 2000.
   E. Selected a statistically valid sample of 70 open § 1203 complaints from the population identified in Step I.C. that were referred either from the IRS to the TIGTA Office of Investigations (10 complaints) or from the TIGTA Office of Investigations to the IRS (60 complaints). Located the complaints and obtained copies of the complaint history documentation. Based the sample selection criteria on the following criteria:

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

| Referred | Total | IMIS | ALERTS | ECMS |
|---|---|---|---|---|
| Population | 247 | 211 | 12 | 24 |
| Precision | 10 % | | | |
| Error Rate | 50% | | | |
| Confidence Level | 95% | | | |
| Sample Size | 70 | 60 | 3 | 7 |

Our precision and error rates were larger in the referred sample than in the non-referred sample (Step I.F.) because, in our opinion, complaints transferred between offices had a higher risk of not being controlled than complaints that were not transferred. We used an expected error rate of 50 percent to provide the largest potential sample. We used a 10 percent precision rate because if we found uncontrolled complaints, the precision of the sample would be immaterial.

F. Selected a statistically valid sample of 103 open § 1203 complaints from the population identified in Step I.D. that were in a "non-referred" status on the IRS systems (69 complaints) or the TIGTA system (34 complaints). Located the complaints and obtained copies of the complaint history documentation. Based the sample selection criteria on the following criteria:

| Non-referred | Total | IMIS | ALERTS | ECMS |
|---|---|---|---|---|
| Population | 966 | 321 | 418 | 227 |
| Precision | 4% | | | |
| Error Rate | 5% | | | |
| Confidence Level | 95% | | | |
| Sample Size | 103 | 34 | 45 | 24 |

II. Determined if § 1203 complaint information was accurately reported in the Fiscal Year (FY) 2000 TIGTA Semiannual Reports to the Congress.

A. Interviewed appropriate CCPAG and CMD personnel to determine:
1. The process for compiling and reporting the required information on terminations

or mitigated cases under § 1203.

    2. The process for compiling and reporting information regarding TIGTA § 1203 complaint investigations.

B. Identified all § 1203 cases reviewed by the Commissioner's 1203 Review Board for FY 2000 and determined if the disciplinary actions (termination or mitigation) taken on these cases were reflected in the respective TIGTA Semiannual Report to the Congress.

C. Determined the accuracy of the general § 1203 information reported in the FY 2000 TIGTA Semiannual Reports to the Congress.

D. Identified all complaints that were coded as § 1203 on the March 2000 IMIS database but were not coded as § 1203 on the September 2000 IMIS database.

**Appendix II**

## Major Contributors to This Report

Maurice S. Moody, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)

Nancy A. Nakamura, Director

Gerald T. Hawkins, Audit Manager

Catherine E. Cloudt, Senior Auditor

Nelva U. Blassingame, Auditor

Yolanda D. Brown, Auditor

Andrew J. Burns, Auditor

**Appendix III**

## Report Distribution List

Commissioner N:C

Assistant Deputy Commissioner N:ADC

Chief, Agency-Wide Shared Services A

Commissioner, Large and Mid-Size Business Division LM

Commissioner, Small Business/Self-Employed Division S

Commissioner, Tax Exempt and Government Entities Division T

Commissioner, Wage and Investment Division W

Chief Counsel CC

Director, Legislative Affairs CL:LA

Director, Office of Program Evaluation and Risk Analysis N:ADC:R:O

National Taxpayer Advocate TA

Office of Management Controls N:CFO:F:M

Audit Liaisons:

Commissioner's Complaint Processing & Analysis Group N:ADC:C

      Chief, Agency-Wide Shared Services A:W

**Appendix IV**

<u>Outcome Measures</u>

This appendix presents detailed information on the measurable impact that our recommended corrective actions will have on tax administration. These benefits will be incorporated into our Semiannual Report to the Congress.

<u>Type and Value of Outcome Measure:</u>

- Reliability of Information:

  Actual – 28 allegations for which computer information was not consistent (see page 7).

  Potential – 38 complaints (± 1.93 percent) where casework may not have been completed and another 125 complaints (± 4.23 percent) where the computer databases may not contain current information (see page 7).

Methodology Used to Measure the Reported Benefit:

**Actual -** We compared the March 2000 Treasury Inspector General for Tax Administration (TIGTA) Investigations Management Information System (IMIS) to the September 2000 TIGTA IMIS and identified 28 allegations that were coded as Section (§) 1203 violations in March, but were no longer coded as § 1203 violations in September. The § 1203 violation code had been removed from the system for these 28 allegations.

**Potential -** We obtained an extract of the TIGTA IMIS and requested all § 1203 records from the Internal Revenue Service's (IRS) Automated Labor and Employee Relations Tracking System and the Executive Correspondence Management System as of September 30, 2000. From these data extracts, we identified 1,213 open § 1203 complaints on the IRS and TIGTA databases as of September 30, 2000. We stratified the § 1203 complaint population into two sub-populations: complaints that were in a referred status and complaints that were not in a referred status.

We randomly selected a statistically valid sample of 173 complaints from the 2 sub-populations. Details of our methodology are presented in Appendix I. The following chart summarizes the population sizes, sample sizes, and the numbers of exceptions (errors) found in each sample.

| Sub-population | Population Size | Sample Size | Exceptions | |
|---|---|---|---|---|
| | | | Complaints that Could Not Be Located | Complaints with Incorrect Status |
| Referred complaints | 247 | 70 | 8 | 14 |
| Non-referred complaints | 966 | 103 | 1 | 8 |
| Totals | 1,213 | 173 | 9 | 22 |

To proportionately weight the results from each sample, we divided each sub-population of complaints (referred and non-referred) by the total population of complaints, as follows.

247 referred complaints / 1,213 total complaints = 0.2036

966 non-referred complaints / 1,213 total complaints = 0.7964

For each exception category (complaints that could not be located and complaints with incorrect status), we calculated the estimated percent of error in the total population, as follows:

## Complaints that could not be located

- Calculated the error rate within each sub-population by dividing the number of complaints that could not be located in each sample by the total number of complaints in that sample.

  8 complaints could not be located / 70 referred complaints sampled = 0.1143

  1 complaint could not be located / 103 non-referred complaints sampled = 0.0097

- Multiplied the error rate from each sub-population by its weighted proportion to the total population and added the results.

  $(0.2036 * 0.1143) + (0.7964 * 0.0097) = 0.0310034726$

  $0.0310034726 = 3.1$ percent error in total population

- Multiplied the total population by the percent of error.

  $1,213 * 3.1$ percent = 38 complaints that could not be located.

### Lower and Upper Limits

- Calculated the lower limit of the error rate.

  $0.0310034726 - NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*$

  $((8/70)*(62/70)/69)+966^2*((966-103)/966)*((1/103)*(102/103)/102))) = 0.0117004877$

- Calculated the upper limit of the error rate.

  $0.0310034726 + NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*$

  $((8/70)*(62/70)/69)+966^2*((966-103)/966)*((1/103)*(102/103)/102))) = 0.0503064574$

- Calculated the difference between the error rate in the total population and the lower and upper limits of error.

  Lower limit: $0.0117004877 - 0.0310034726 = -0.0193029848$ (negative 1.93 percent)

  Upper limit: $0.0503064574 - 0.0310034726 = 0.0193029848$ (positive 1.93 percent)

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

## Complaints with incorrect status

- Calculated the error rate within each sub-population by dividing the number of instances where the computer databases did not contain current information in each sample by the total number of complaints in that sample.

  14 complaints with incorrect status / 70 referred complaints sampled = 0.2000

  8 complaints with incorrect status / 103 non-referred complaints sampled = 0.0777

- Multiplied the error rate from each sub-population by its weighted proportion to the total population and added the results.

  (0.2036 * 0.2000) + (0.7964 * 0.0777) = 0.1025796589

  0.1025796589 = 10.26 percent error in total population

- Multiplied the total population by the percent of error.

  1,213 * 10.26 percent = 125 complaints where the computer databases may not contain current information.

  ### Lower and Upper Limits

- Calculated the lower limit of the error rate.

  0.1025796589–NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*

  ((14/70)*(56/70)/69)+966^2*((966-103)/966)*((8/103)*(95/103)/102))) = 0.0602323072

- Calculated the upper limit of the error rate.

  0.1025796589+NORMSINV(0.975)*SQRT((1/1213)^2*(247^2*((247-70)/247)*

  ((14/70)*(56/70)/69)+966^2*((966-103)/966)*((8/103)*(95/103)/102))) = 0.1449270105

- Calculated the difference between the error rate in the total population and the lower and upper limits of error.

  Lower limit: 0.0602323072 – 0.1025796589 = -0.0423473517 (negative 4.23 percent)

http://www.treas.gov/tigta/auditreports/2001reports/200110188fr.html

Upper limit: 0.1449270105 − 0.1025796589 = 0.0423473517 (positive 4.23 percent)

**Appendix V**

<u>Internal Revenue Service Restructuring and Reform Act of 1998 Section 1203 Provisions Requiring Termination of Employment</u>

The Internal Revenue Service (IRS) must terminate the employment of an IRS employee (absent direct intervention by the IRS Commissioner) if there is a final administrative or judicial determination that, in the course of his or her official duties, the employee committed one of the following provisions:

**§ 1203(b)(1)** Willful failure to obtain the required approval signatures on documents authorizing the seizure of a taxpayer's home, personal belongings, or business assets.

**§ 1203(b)(2)** Providing false statements under oath with respect to a material matter involving a taxpayer or taxpayer representative.

**§ 1203(b)(3)** With respect to a taxpayer, taxpayer representative, or other employee of the IRS, the violation of:

A. Any right under the Constitution of the United States; or
B. Any civil right established under:
  i. Title VI or VII of the Civil Rights Act of 1964,
  ii. Title IX of the Education Amendments of 1972,
  iii. The Age Discrimination in Employment Act of 1967,
  iv. The Age Discrimination Act of 1975,
  v. Section 501 or 504 of the Rehabilitation Act of 1973, or
  vi. Title I of the Americans with Disabilities Act of 1990.

**§ 1203(b)(4)** Falsifying or destroying documents to conceal mistakes made by any employee with respect to a matter involving a taxpayer or taxpayer representative.

**§ 1203(b)(5)** Assault or battery on a taxpayer, taxpayer representative, or other employee of the IRS, but only if there is a criminal conviction, or a final adverse judgment by a court in a civil case, with respect to the assault or battery.

**§ 1203(b)(6)** Violations of the Internal Revenue Code (I.R.C.) of 1986, Department of Treasury regulations, or policies of the IRS

(including the Internal Revenue Manual) for the purpose of retaliating against, or harassing, a taxpayer, taxpayer representative, or other employee of the IRS.

**§ 1203(b)(7)** Willful misuse of the provisions of § 6103 of the I.R.C. of 1986 for the purpose of concealing information from a Congressional inquiry.

**§ 1203(b)(8)** Willful failure to file any tax return required under the I. R.C. of 1986 on or before the date prescribed therefore (including any extensions), unless such failure is due to reasonable cause and not to willful neglect.

**§ 1203(b)(9)** Willful understatement of Federal tax liability, unless such understatement is due to reasonable cause and not willful neglect.

**§ 1203(b)(10)** Threatening to audit a taxpayer for the purpose of extracting personal gain or benefit.

**Appendix VI**

## Internal Revenue Service Commissioner's Complaint Processing & Analysis Group's Response to the Draft Report

The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

**Appendix VII**

# Treasury Inspector General for Tax Administration Office of Investigations' Response to the Draft Report

The response was removed due to its size. To see the complete response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

200110081fr2

# Management Advisory Report: No Violations of the Fair Debt Collection Practices Act Resulted in Administrative or Civil Actions (Fiscal Year 2001)

## July 2001

## Reference Number: 2001-10-081

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

July 24, 2001

MEMORANDUM FOR DEPUTY COMMISSIONER CHIEF COUNSEL

FROM: Pamela J. Gardiner /s/ Pamela J. Gardiner

Deputy Inspector General for Audit

SUBJECT: Final Management Advisory Report - No Violations of the Fair Debt Collection Practices Act Resulted in Administrative or Civil Actions (Fiscal Year 2001)

This report presents the results of our Fiscal Year 2001 Fair Debt Collection Practices Act (FDCPA) review. In summary, we found no violations of the FDCPA reported by Internal Revenue Service (IRS) management that resulted in an administrative action against an employee. Additionally, there were no civil actions that resulted in the IRS paying monetary settlements to taxpayers because of an FDCPA violation.

IRS management agreed with the observations in the draft report. The full text of their comments is included as an appendix.

Copies of this report are also being sent to the IRS managers who are affected by the report. Please contact me at (202) 622-6510 if you have any questions or Maurice S. Moody, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs), at (202) 622-8500.

# Exhibit B 6

# Table of Contents

Executive Summary

Objective and Scope

Background

Results

    No Fair Debt Collection Practices Act Violations Resulted in Administrative Action

    No Civil Actions Coded as Fair Debt Collection Practices Act Violations Were Closed During Our Audit Period

Conclusion

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Management's Response to the Draft Report

## Executive Summary

The Fair Debt Collection Practices Act (FDCPA) includes provisions that restrict various collection abuses and harassment in the private sector that did not apply to the United States (U.S.) Government at the time the FDCPA was enacted. However, the Internal Revenue Service (IRS) Restructuring and Reform Act of 1998 (RRA 98) requires the IRS to comply with certain provisions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers. In addition, taxpayers who believe their FDCPA rights were violated can file a civil action against the U.S. Government under the Civil Damages for Certain Unauthorized Collection Actions statute.

Section 1102 (d)(1)(G) of the RRA 98 requires the Treasury Inspector General for Tax Administration (TIGTA) to include in one of its semiannual reports to the Congress information regarding any administrative or civil actions related to FDCPA violations. The semiannual report must provide a summary of such taxpayer actions and include any judgments or awards granted. Accordingly, the

objective of this review was to obtain information on IRS administrative and civil actions resulting from violations of the FDCPA by IRS employees. The TIGTA reviewed cases coded as FDCPA violations on IRS computer systems opened after July 22, 1998, and closed during the period April 1 through December 31, 2000.

## Results

Based on a review of information coded as potential FDCPA violations on the IRS' computer systems, there were no violations that resulted in the IRS taking an administrative action against an employee. In addition, the IRS did not have any closed civil actions involving FDCPA violations. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations.

## No Fair Debt Collection Practices Act Violations Resulted in Administrative Action

To determine if any FDCPA violations resulted in an administrative action, the TIGTA reviewed cases coded as FDCPA violations on the Automated Labor and Employee Relations Tracking System. Review of all 28 cases coded as FDCPA during the audit period did not identify any FDCPA violations that resulted in an administrative action being taken against an IRS employee. These 28 cases were either miscoded as FDCPA violations (19) or closed without administrative action (9).

## No Civil Actions Coded as Fair Debt Collection Practices Act Violations Were Closed During Our Audit Period

Civil actions filed by taxpayers against the IRS are input to the Counsel Automated System Environment (CASE) for tracking. During the audit period, the CASE did not contain any closed civil actions coded as FDCPA. As a result, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations during the period of this review.

Case information from the Department of Justice's (DOJ) Tax Division was obtained to better ensure civil actions involving FDCPA violations were captured on the CASE. Because the DOJ does not track FDCPA violations separately, the TIGTA reviewed the cases filed under Civil Damages for Certain Unauthorized Collection Actions, which allows taxpayers to sue the IRS for violations of the Internal Revenue Code related to collection actions. Seven cases were opened on or after July 22, 1998, and closed during the period April 1 through December 31, 2000. None of the seven cases involved FDCPA violations.

Management's Response: IRS management agreed with the observations in the draft report. Management's complete response to the draft report is included as Appendix IV.

## Objective and Scope

The objective of this review was to obtain information on Internal Revenue Service (IRS) administrative and civil actions resulting from violations of the Fair Debt Collection Practices Act (FDCPA) by IRS employees. Fieldwork was performed in the Strategic Human Resources, Agency-Wide Shared Services, and Chief Counsel functions in the National Headquarters during the period February to March 2001. This review was performed in accordance with the President's Council on Integrity and Efficiency's *Quality Standards for Inspections*.

For this Fiscal Year (FY) 2001 review, closed cases from the Automated Labor and Employee Relations Tracking System (ALERTS) and the Counsel Automated System Environment (CASE) were analyzed to identify violations of the FDCPA. However, the Treasury Inspector General for Tax Administration (TIGTA) cannot ensure that cases recorded on the ALERTS encompass all potential FDCPA violations. As stated in a FY 2000 report on the FDCPA, data captured on the ALERTS related to potential FDCPA violations may not be complete and accurate. During this FY 2001 review, the TIGTA did not determine the accuracy or consistency of disciplinary actions taken against employees for potential FDCPA violations.

Details of our objective, scope, and methodology are presented in Appendix I. Major contributors to this report are listed in Appendix II.

## Background

Section 1102 (d)(1)(G) of the IRS Restructuring and Reform Act of 1998 (RRA 98) requires the TIGTA to include in one of its semiannual reports to the Congress information regarding any administrative or civil actions related to FDCPA violations. The semiannual report must provide a summary of such taxpayer actions and include any judgments or awards granted.

The IRS' definition of administrative action includes disciplinary actions ranging from admonishment through removal. Lesser actions, such as oral or written counseling, are not considered administrative actions. The IRS' definition of administrative actions was used when determining the number of FDCPA violations to be reported to the Congress.

The FDCPA includes provisions that restrict various collection abuses and harassment in the private sector that did not apply to the federal government at the time the FDCPA was enacted. The RRA 98 requires the IRS to comply with certain provisions of the FDCPA and to be at least as considerate to taxpayers as private creditors are required to be with their customers. Specifically, the IRS may not communicate with taxpayers in connection with the collection of any unpaid tax:

- At unusual or inconvenient times.
- If the IRS knows that the taxpayer has obtained representation from a person authorized to practice before the IRS, and the IRS knows or can easily obtain the representative's name and address.
- At the taxpayer's place of employment, if the IRS knows or has reason to know that such

communication is prohibited.

Further, the IRS may not harass, oppress, or abuse any person in connection with any tax collection activity or engage in any activity that would naturally lead to harassment, oppression, or abuse. Such conduct specifically includes (but is not limited to) the use or threat of violence or harm, use of obscene or profane language, causing a telephone to ring continuously with harassing intent, and the placement of telephone calls without meaningful disclosure of the caller's identity.

If taxpayers believe the IRS has violated their FDCPA rights, they may file an administrative claim for damages with the applicable IRS executive for the location where the taxpayer resides or file for civil damages in a federal district court.

Taxpayer complaints about IRS employees' conduct can be reported to several IRS functions for tracking on management information systems. If a taxpayer files a civil action or if IRS management determines that the taxpayer's FDCPA rights were potentially violated, the complaint could be referred and tracked on one or both of the following IRS systems:

- Office of Workforce Relations' ALERTS, which generally tracks employee behavior that may warrant IRS management administrative actions.
- Chief Counsel's CASE, which is an inventory control system that tracks items such as taxpayer civil actions or bankruptcies.

The IRS implemented FDCPA codes on the ALERTS in March 1999 and on the CASE in June 1999.

## Results

Based upon a review of information coded as potential FDCPA violations on the IRS' computer systems, there were no violations that resulted in the IRS taking an administrative action against an employee for the period April 1 through December 31, 2000. In addition, the IRS did not have any closed civil actions involving FDCPA violations for this period. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations.

## No Fair Debt Collection Practices Act Violations Resulted in Administrative Action

IRS managers investigate a taxpayer complaint against an employee and coordinate with the local Labor Relations office to determine the appropriate level of disciplinary action. If the misconduct requires an administrative action, managers refer the complaint to the local Labor Relations office, which tracks it on the ALERTS. The following categories were established on the ALERTS to track potential FDCPA violations:

      o Contact with a taxpayer at an unusual location or time.

200110081fr2

- Direct contact with a taxpayer without the consent of the taxpayer's representative.
- Contact with a taxpayer at his or her place of employment when prohibited.
- Conduct which is intended to harass or abuse a taxpayer.
- Use of obscene or profane language toward a taxpayer.
- Continuous telephone calls to a taxpayer with the intent to harass.
- Telephone calls to a taxpayer without meaningful disclosure of the employee's identity.

To determine if any FDCPA violations resulted in an administrative action, the TIGTA reviewed cases from the ALERTS coded as potential FDCPA violations that were opened after July 22, 1998, and closed during the period April 1 through December 31, 2000. Review of all 28 cases coded as FDCPA violations did not identify any FDCPA violations that resulted in an administrative action being taken against an employee.

Nineteen of the 28 cases reviewed from the ALERTS were incorrectly coded as FDCPA violations. The other nine cases were closed without administrative action. The TIGTA previously identified miscoding of FDCPA cases on the ALERTS and made a recommendation to address this issue in a FY 2000 report on the FDCPA. IRS management agreed to take corrective actions to better ensure FDCPA violations are properly identified and reported.

## No Civil Actions Coded as Fair Debt Collection Practices Act Violations Were Closed During Our Audit Period

Civil actions filed by taxpayers against the IRS are input to the CASE database by District Counsel, who are responsible for coding the case with the appropriate category code.

For cases opened after July 22, 1998, and closed during the period April 1 through December 31, 2000, the CASE did not include any closed civil actions coded as FDCPA. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations during the period of this review.

Case information from the Department of Justice's (DOJ) Tax Division was obtained to better ensure civil actions involving FDCPA violations were captured on the CASE. Because the DOJ does not track FDCPA violations separately, the TIGTA reviewed the cases filed under Civil Damages for Certain Unauthorized Collection Actions, which allows taxpayers to sue the IRS for violations of the Internal Revenue Code related to collection actions. Seven cases were initiated on or after July 22, 1998, and closed during the period April 1 through December 31, 2000. None of the seven cases involved FDCPA violations.

Management's Response: IRS management in the Office of the Chief Counsel and the Workforce Relations Division in Strategic Human Resources considered the report to be accurate and complete and were in agreement with its findings.

# Conclusion

Based upon a review of information coded as potential FDCPA violations on the IRS' computer systems, there were no violations that resulted in the IRS taking an administrative action against an employee for the period April 1 through December 31, 2000. In addition, the IRS did not have any closed civil actions involving FDCPA violations for this period. Accordingly, the IRS did not pay any money to taxpayers for civil actions resulting from FDCPA violations.

**Appendix I**

## Detailed Objective, Scope, and Methodology

The objective of this review was to obtain information on Internal Revenue Service (IRS) administrative and civil actions resulting from violations of the Fair Debt Collection Practices Act (FDCPA) by IRS employees. Specifically, we:

I. Determined the number of FDCPA violations resulting in administrative actions.
   A. Obtained a computer extract from the Automated Labor and Employee Relations Tracking System (ALERTS) of 28 cases that were opened after July 22, 1998, and closed during the period April 1 through December 31, 2000, coded as FDCPA violations.
      1. Analyzed available ALERTS information to ensure the cases were accurately coded as FDCPA violations.
      2. Obtained additional case file information from the local Labor Relations offices to determine if cases were coded accurately as FDCPA violations.
   B. Determined if any cases involving FDCPA violations resulted in an administrative action.
      1. Reviewed the final disposition code for the cases involving FDCPA violations.
      2. Determined if any cases resulted in a minimum disciplinary action of admonishment.
      3. Reviewed case file information from the local Labor Relations offices, if necessary, to determine if the violations occurred after July 22, 1998.
II. Determined if there were any IRS civil actions (judgments and awards granted) resulting from violations of the FDCPA.
   A. Requested a computer extract from the Counsel Automated System Environment (CASE) for Subcategory 511 (established to track FDCPA violations) cases opened after July 22, 1998, and closed during the period April 1 through December 31, 2000. (Note: No cases met our criteria for review.)
   B. Requested copies from the Department of Justice's Tax Division of any complaints opened on or after July 22, 1998, involving any Internal Revenue Code § 7433 civil action and closed during the period April 1 through December 31, 2000.

**Appendix II**

## Major Contributors to This Report

Maurice S. Moody, Assistant Inspector General for Audit (Headquarters Operations and Exempt Organizations Programs)

Nancy A. Nakamura, Director

Jeffrey M. Jones, Audit Manager

Mark Judson, Senior Auditor

Margaret A. Anketell, Auditor

**Appendix III**

## Report Distribution List

Commissioner N:C

Chief, Agency-Wide Shared Services A

Associate Chief Counsel (Procedure and Administration) CC:P&A

Director, Office of Workforce Relations N:ADC:H:R

Director, Personnel Services A:PS

Director, Strategic Human Resources N:ADC:H

Chief Counsel CC

Director, Legislative Affairs CL:LA

Director, Office of Program Evaluation and Risk Analysis N:ADC:R:O

National Taxpayer Advocate TA

Office of Management Controls N:CFO:F:M

Audit Liaisons:

# Appendix IV

## Management's Response to the Draft Report

The response was removed due to its size. To see the response, please go to the Adobe PDF version of the report on the TIGTA Public Web Page.

Director, Strategic Human Resources N:ADC:H

Director, Office of Workforce Relations N:ADC:H:R

Associate Chief Counsel (Procedure and Administration) CC:P&A

Chief Counsel CC

Chief, Agency-Wide Shared Services A

200110081fr2

Case 1:06-cv-00129-RBW    Document 12-3    Filed 03/20/2007    Page 74 of 97

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

# Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

## May 2000

## Reference Number: 2000-40-071

**This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.**

May 23, 2000

MEMORANDUM FOR COMMISSIONER ROSSOTTI

FROM: (for) Pamela J. Gardiner /s/ Margaret E. Begg

Deputy Inspector General for Audit

SUBJECT: Final Audit Report - Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

This report presents the results of our review of the effectiveness of the Internal Revenue Service's (IRS) controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS. In summary, we found Chief Counsel's management information system adequate to control the inventory of civil cases. However, we believe that the result of the cases and the damage amounts, if any, need to be captured in the Chief Counsel's management information system to allow systemic improvements that could prevent future violations of taxpayer privacy and rights.

As a result of this review, we recommend that the results of the cases and the damage amounts, if any, need to be captured in the management information system. In addition, a formal process should be established to refer lost and settled cases to either Treasury

**Exhibit B 7**

Case 1:06-cv-00129-RBW    Document 12-3    Filed 03/20/2007    Page 75 of 97

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

Inspector General for Tax Administration for possible criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any changes are necessary to protect taxpayer privacy and rights.

IRS management generally agreed with these recommendations for the need in improvements in Chief Counsel's management information system. Management's comments have been incorporated into the report where appropriate, and the full text of their comments is included as an appendix.

Copies of this report are also being sent to the IRS managers who are affected by the report recommendations. Please contact me at (202) 622-6510 if you have questions, or your staff may call Walter E. Arrison, Associate Inspector General for Audit, (Wage and Investment Income Programs), at (770) 986-5720.

## Table of Contents

Executive Summary

Objective and Scope

Background

Results

      The Chief Counsel's Management Information System Needs to Capture Additional Data Elements

Conclusion

Appendix I – Detailed Objective, Scope, and Methodology

Appendix II – Major Contributors to This Report

Appendix III – Report Distribution List

Appendix IV – Additional Information Regarding Civil Cases

Appendix V – Management's Response to the Draft Report

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

## Executive Summary

There are several matters in which a taxpayer can file a civil complaint against the Internal Revenue Service (IRS). These include violations of the Privacy Act and a Freedom of Information Act appeal. In addition, certain sections of the Internal Revenue Code (I.R.C.) allow taxpayers to file civil complaints for damages against the United States Government for conduct or lack of conduct on the part of IRS personnel.

The IRS Restructuring and Reform Act of 1998 (RRA 98) placed emphasis on policies and procedures protecting taxpayer privacy and rights. Therefore, the IRS needs to be aware of how current policy and procedure affect taxpayer confidentiality.

The overall objective of this review was to determine the effectiveness of the IRS' controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS. See Appendix IV for additional information regarding the types of civil complaints that can be filed involving the IRS.

## Results

The Office of the Chief Counsel uses a fully integrated, nationwide management information system to control and monitor its workload. Various data elements are captured within the management information system, allowing for case and issue tracking. Additionally, the system is regularly updated to reflect the status of and the amount of time that was charged to the case. There were approximately 46,000 civil cases closed in the Office of the Chief Counsel management information system during the period January 1, 1998, through September 30, 1999. We found the IRS Office of the Chief Counsel management information system adequate to control the inventory of civil cases. However, we believe that additional data elements need to be captured to allow systemic improvements that could prevent future violations of taxpayer privacy and rights.

## The Chief Counsel's Management Information System Needs to Capture Additional Data Elements

The Office of the Chief Counsel is not consistently capturing the necessary elements in its management information system to ensure the IRS takes appropriate action to protect future taxpayer privacy and rights. The results of the cases and damage amounts, if any, need to be captured to allow the IRS to assess policies and procedures which protect taxpayer confidentiality and ensure equitable treatment of taxpayers.

The Office of the Chief Counsel officials indicated that case disposition is not always captured in the management information system because there is no regulation or policy which requires this type of information, and they do not have a use for this data. Additionally, the Department of Justice (DOJ)

Case 1:06-cv-00129-RBW    Document 12-3    Filed 03/20/2007    Page 77 of 97

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

represents the Government for the cases alleging violation of the I.R.C., and the Office of the Chief Counsel is not always informed of the outcome of these cases. When received in the Office of the Chief Counsel, I.R.C. §7431 complaints are forwarded to the Treasury Inspector General for Tax Administration (TIGTA) for research on any open investigation on employees cited in the complaint. However, no further referrals are made to the TIGTA after the cases are closed for possible criminal investigation. The Office of the Chief Counsel also works with IRS management to obtain necessary information to develop a defense strategy. However, no formal process is in place for cases that are lost or settled, to ensure the IRS reviews and makes the appropriate changes to established policies and procedures. We believe the IRS needs to be aware of all outcomes for these cases and damage amounts, if any, need to be captured in the Office of the Chief Counsel's management information system. The lost and settled cases need to be analyzed to determine if systemic improvements are needed to better protect future taxpayer privacy and rights.

## Summary of Recommendations

The IRS Office of the Chief Counsel should obtain from the DOJ all results of civil cases involving IRS employees and capture results in the management information system. The lost and settled cases should be referred to the TIGTA for possible criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any systemic changes are necessary to protect taxpayer privacy and rights.

Management's Response: The Chief Counsel will modify the management information system to provide additional fields for entry of information regarding the ultimate outcome in all the various types of cases and adopt formal procedures requiring personnel to request information regarding case outcomes. Further, the Chief Counsel will adopt formal procedures requiring the appropriate IRS functional management to be notified of the outcome of every case.

In addition, Chief Counsel attorneys will notify IRS functional management of Treasury Department standards governing referrals to TIGTA and provide a recommendation, if appropriate.

## Objective and Scope

The overall objective of this review was to determine the effectiveness of the Internal Revenue Service's (IRS) controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS.

The audit was performed because the Senate Finance Committee had concerns regarding the process of controlling and monitoring these cases. As a result, the Treasury Inspector General for Tax Administration (TIGTA) initiated this review. The audit work was conducted during the period September 1999 through November 1999, at the IRS Chief Counsel offices in Washington, DC. The audit work was performed in accordance with *Government Auditing Standards*.

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

Details of our audit objective, scope, and methodology are presented in Appendix I. Major contributors to this report are listed in Appendix II.

## Background

There are several matters in which a taxpayer can file a civil complaint against the IRS. These include violations of the Privacy Act and a Freedom of Information Act appeal. In addition, certain sections of the Internal Revenue Code (I.R.C.) allow taxpayers to file civil complaints for damages against the Government for conduct or lack of conduct on the part of IRS personnel. (See Appendix IV for additional information regarding the types of civil complaints that can be filed involving the IRS.)

The IRS Restructuring and Reform Act of 1998 (RRA 98) placed emphasis on policies and procedures protecting taxpayer privacy and rights. RRA 98 §3802 requires the Joint Committee on Taxation to conduct a study on provisions regarding taxpayer confidentiality. The study is to include an examination of present-law protections of taxpayer privacy.

The Office of the Chief Counsel's responsibility differs depending upon the reason for the complaint. The Office of the Chief Counsel is responsible for presenting and defending the Government's position for Tax Court cases. However, the Department of Justice (DOJ) is responsible for defending the other civil cases involving the IRS, including all actions alleging violation of the I.R.C. For these cases, the Office of the Chief Counsel is responsible only for providing assistance to the DOJ on possible defense strategies.

## Results

The Office of the Chief Counsel uses a fully integrated, nationwide management information system to control and monitor its workload. This system automates the full range of litigation, technical rulings, and administrative management functions of the Office of the Chief Counsel.

Various data elements are captured within the management information system, allowing for case and issue tracking. Additionally, the system is regularly updated to reflect the status of and the amount of time that was charged to the case.

There were approximately 46,000 civil cases closed in the Office of the Chief Counsel's management information system during the period January 1, 1998, through September 30, 1999. We found the IRS Office of the Chief Counsel's management information system adequate to control the inventory of civil cases. However, we believe that additional data elements need to be captured identifying the results of these cases. Trend analyses could be performed allowing the IRS to assess operations to determine if policies and procedures are effectively protecting taxpayer privacy and rights.

## The Chief Counsel's Management Information System Needs to Capture Additional Data

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

## Elements

The Office of the Chief Counsel is not consistently capturing the necessary elements in its management information system to ensure the IRS takes appropriate action to protect future taxpayer rights. The results of the cases and damage amounts, if any, need to be captured to allow the IRS to assess policies and procedures which protect taxpayer confidentiality and ensure equitable treatment of taxpayers.

When a complaint is received by the Office of the Chief Counsel, various data elements are entered into the management information system, including the name of the case, an opening date, and the type of case. When the case is completed, a closed date is entered and the status is changed to closed. In some instances, an explanation of the outcome of the case (i.e., the case was dismissed, won, settled, or lost) is also entered. However, this is not a requirement, nor is it consistently captured.

The Office of the Chief Counsel officials indicated that closed case disposition is not always captured in the management information system because there is no regulation or policy which requires this type of information, and they do not have a use for this data. Additionally, the DOJ represents the Government for the cases alleging violation of the I.R.C., and the Office of the Chief Counsel is not always informed of the outcome of these cases.

I.R.C. §7431, Improper Disclosure of Returns and Return Information, states that a person may sue for civil damages if any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any tax return or tax return information with respect to the taxpayer in violation of any provision of I.R.C. §6103.

When received in the Office of the Chief Counsel, I.R.C. §7431 complaints are forwarded to the TIGTA for research on any open investigations on employees cited in the complaint. However, no further referrals are made to the TIGTA after the cases are closed, for possible criminal investigation.

In cases which are lost or settled, the potential exists that an IRS employee has performed a criminal violation. Therefore, once a case is closed, the lost or settled cases should be referred to the TIGTA for possible investigation.

Additionally, the Office of the Chief Counsel works with IRS management to obtain necessary information to develop a defense strategy. However, no formal process is in place for cases that are lost or settled, to ensure the IRS reviews and makes the appropriate changes to established policies and procedures.

For example, one I.R.C. §7431 complaint against the IRS was settled for improper access to the taxpayer's information and disclosure of the tax return information to a third party. The settlement resulted in the taxpayer receiving over $41,000 for damages and fees. We did not find any indications that this case was subsequently reviewed after it was settled to determine if systemic changes were needed in IRS policies or procedures.

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

The passing of the RRA 98 placed emphasis on policies and procedures protecting taxpayer privacy and rights. We believe the IRS needs to be aware of all outcomes for civil complaints involving IRS employees. The lost and settled cases would be analyzed to determine the appropriate course of action to prevent future violations of taxpayer privacy and rights.

## Recommendations

1. The Office of the Chief Counsel should obtain all results of civil cases involving IRS employees from the DOJ. The results of all cases should be captured in the Office of the Chief Counsel's management information system to allow for the ready identification of any lost or settled cases.

   Management's Response: The Chief Counsel will modify the management information system to provide additional fields for entry of information regarding the ultimate outcome in all the various types of cases discussed in the report. However, the IRS and the Office of Chief Counsel are in the midst of a massive organizational restructuring as well as a major effort to upgrade our basic technology infrastructure. Computer programming efforts that are directly related to the current tax-filing season, to implementation of new tax laws, and to these major modernization efforts must be given priority over all other projects.

   The Chief Counsel will adopt formal procedures requiring personnel who are responsible for monitoring these cases to request information regarding case outcomes. While this practice has been followed informally in some offices, the Chief Counsel agrees it should be required uniformly.

2. The Office of the Chief Counsel should establish a formal process to refer lost and settled cases either to the TIGTA for criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any systemic changes are necessary to protect taxpayer privacy and rights.

Management's Response: The Chief Counsel will adopt formal procedures requiring the appropriate IRS functional management be notified of the outcome of every case of this type including cases that the government wins or settles on a favorable basis as well as those that result in a loss or settlement adverse to the government's position.

In addition, Chief Counsel attorneys will be instructed also to advise management of the Treasury Department standards governing referrals to TIGTA at the time IRS functional management is informed of the results of the case, and provide a recommendation as to whether such a referral is appropriate in light of the outcome of the case.

## Conclusion

Case 1:06-cv-00129-RBW    Document 12-3    Filed 03/20/2007    Page 81 of 97

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

We found the Office of the Chief Counsel's management information system adequate to control the inventory of civil cases. However, we believe that the results of the cases and the damage amounts, if any, need to be captured in the management information system. Additionally, a formal process should be established to refer lost and settled cases to either TIGTA for possible criminal investigation and/or IRS functional management for review of IRS policy and procedures to determine if any systemic changes are necessary to protect taxpayer privacy and rights.

## Appendix I

Detailed Objective, Scope, and Methodology

The overall objective of this review was to determine the effectiveness of the Internal Revenue Service's (IRS) controls over civil suits against the Government. We focused on civil suits which taxpayers can file involving the IRS. To accomplish our objective, we:

I.  Assessed the process for controlling and monitoring settlement cases and identified any lack of controls and/or control weaknesses.

   A.  Identified all possible civil cases that could be filed against the Government involving the IRS. Identified approximately 46,000 civil cases closed during the period January 1, 1998, through September 30, 1999.
   B.  Identified and reviewed the IRS policies and procedures regarding these cases and determined how settlement cases are processed.
   C.  Reviewed seven Internal Revenue Code (I.R.C.) §7431 case files which were included on the Department of Justice's (DOJ) list of settlement cases for the period of January 1, 1998, through August 31, 1999, and determined whether appropriate documentation existed to identify case disposition.
   D.  Interviewed Office of the Chief Counsel employees and identified the process used to track and monitor civil cases taxpayers filed involving the IRS.

I.  Evaluated the IRS management information system used to control civil cases involving settlements against the IRS for accuracy, completeness, and usefulness.

   A.  Reviewed input sheets and documentation regarding database categories for the Office of the Chief Counsel's management information system and determined the type of information that was maintained.
   B.  Obtained from the DOJ a report of cases involving settlements for the period January 1,1998, through August 31,1999, and compared to information obtained from the Office of Chief Counsel management information system and determined whether it was complete.
   C.  Traced the seven I.R.C. §7431 cases listed on the DOJ's list of settlement cases the IRS case files and determined the accuracy of the IRS records.

D. Interviewed Office of Chief Counsel employees and determined the process for entering data into the management information system, uses of the system, and the type of information maintained.

## Appendix II

## Major Contributors to This Report

Walter E. Arrison, Associate Inspector General for Audit (Wage and Investment Income Programs)

Michael Phillips, Director

Debbie Gregory, Audit Manager

Patricia Lee, Audit Manager

Kent Johnson, Senior Auditor

Frank Jones, Senior Auditor

John O'Rourke, Senior Auditor

Thomas Dori, Auditor

Bobbie Draudt, Auditor

Peter Stoughton, Auditor

## Appendix III

## Report Distribution List

Deputy Commissioner Operations C:DO

Office of the Chief Counsel CC

Assistant Chief Counsel (Disclosure Litigation) CC:EL:D

Assistant Chief Counsel (General Litigation) CC:EL:GL

Case 1:06-cv-00129-RBW     Document 12-3     Filed 03/20/2007     Page 83 of 97

Improvements Are Needed in the Chief Counsel's Management Information System to Better Protect Taxpayer Privacy and Rights

National Director for Legislative Affairs CL:LA

Office of Management Controls M:CFO:A:M

Director, Office of Program Evaluation and Risk Analysis M:O

Office of the National Taxpayer Advocate C:TA

## Appendix IV

Additional Information Regarding Civil Cases

There are several matters in which a taxpayer can file a civil complaint that involves the Internal Revenue Service (IRS). These include violations of the following:

- o Privacy Act. The Privacy Act not only allows individuals to obtain their own records, it also gives the individual the right to correct, amend, or delete information that is inaccurate, irrelevant, outdated, or incomplete.
- o Freedom of Information Act (FOIA). The FOIA creates procedures whereby any member of the public may obtain the records of the agencies of the Government.
- o Internal Revenue Code (I.R.C.) §7422 (Civil Actions for Refund). A taxpayer can file a suit for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected.
- o I.R.C. §7426 (Civil Actions by Persons Other Than Taxpayers). Persons other than the taxpayer whose property is wrongfully levied upon to satisfy another taxpayer's liability may bring a civil action against the United States.
- o I.R.C. §7431 (Improper Disclosure of Returns and Return Information). A person may sue for civil damages if any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to the taxpayer in violation of any provision of I.R.C. § 6103.
- o I.R.C. §7432 (Civil Damages for Failure to Release Lien). A taxpayer may bring a civil action for damages against the United States if any officer or employee of the IRS knowingly, or by reason of negligence, fails to release a lien under I.R.C. §6325 on property of the taxpayer.
- o I.R.C. §7433 (Civil Damages for Certain Unauthorized Collection Actions). This section permits a taxpayer to recover civil damages arising from an IRS officer's or employee's negligent disregard of any provision of the I.R.C. or the Department of the Treasury regulations in connection with the collection of federal tax from the taxpayer.
- o I.R.C. §7435 (Civil Damages for Unauthorized Enticement of Information Disclosure). A taxpayer may sue for civil damages if any officer or employee of the United States intentionally compromises the determination or collection of any tax due from an attorney, certified public accountant, or enrolled agent representing the taxpayer in exchange for

information conveyed by the taxpayer to the attorney, certified public accountant, or enrolled agent for purposes of obtaining advice concerning the taxpayer's tax liability.

## Appendix V

Management's Response to the Draft Report

The response was removed due to its size. To see the complete response, please see the Adobe PDF version of the report on the TIGTA Public Web Page.

NATIONAL TAXPAYER ADVOCATE 2005 ANNUAL REPORT TO CONGRESS
EXECUTIVE SUMMARY

## THE MOST SERIOUS PROBLEMS ENCOUNTERED BY TAXPAYERS

Internal Revenue Code § 7803(c)(2)(B)(ii)(III) requires the National Taxpayer Advocate to describe at least 20 of the most serious problems encountered by taxpayers. This year's report describes 21 problems. In each case, the report includes the National Taxpayer Advocate's description of the problem, the IRS's response, and the National Taxpayer Advocate's final comments and recommendations. This format provides a clear picture of which steps have been taken to address the most serious problems and which additional steps the National Taxpayer Advocate believes are required.

The 21 problems described in the report are as follows:

**1. Trends in Taxpayer Service.** As the IRS proposes to allocate more resources to collection, examination, and criminal investigation functions and fewer resources to taxpayer service functions, the IRS is also increasing efforts to "migrate" taxpayers toward electronic services and away from face-to-face contact. Before altering the mix of service and enforcement, the National Taxpayer Advocate believes the IRS should spend more time studying what types of services different taxpayer segments need and how best to deliver these services to help taxpayers remain compliant. The National Taxpayer Advocate recommends that the IRS undertake a research-driven needs-assessment, from the taxpayers' perspective, to help identify what services taxpayers need and want and how best to deliver them. An assessment of needs will also help identify groups of taxpayers that may be resistant to, or unable to access, certain services. Once the IRS conducts a detailed assessment and understands how any proposed changes to taxpayer service may affect compliance, the IRS should develop a detailed strategy for migrating taxpayers from the current to the proposed model of delivering taxpayer service.

**2. Criminal Investigation Refund Freezes.** The IRS Criminal Investigation function (CI), through its Questionable Refund Program (QRP), places a "freeze" on hundreds of thousands of refund claims each year that it believes may contain indicia of fraud. CI personnel currently review the refund claims and "determine" whether they are fraudulent – without notifying taxpayers that their claims are under review and without giving taxpayers an opportunity to present documentation supporting their positions. Last year, the Taxpayer Advocate Service (TAS) received more than 28,000 requests for assistance from taxpayers whose refunds had been frozen. TAS studied a randomly selected sample of nearly 500 cases to determine the ultimate disposition of these cases. When TAS assisted the taxpayers, CI ultimately agreed to issue the full amount of the refund claimed (or more) in 66 percent of the decided cases and to issue a partial refund in an additional 14 percent of the decided cases. Thus, taxpayers received a full or partial refund in 80 percent of frozen-refund cases brought to TAS. The median Adjusted Gross Income (AGI) of these taxpayers was $13,330, and the median refund was $3,519. Thus, the refund constituted, on average, more than 26 percent of the claimant's AGI for the year, and the taxpayers were required to wait, on average, more than 8-1/2 months to receive their refunds. The National Taxpayer Advocate believes that the QRP is an important program to protect against tax fraud, but the IRS must implement procedures to notify taxpayers that their refunds have been frozen, provide taxpayers with an opportunity to submit documentation, and bring cases to a quicker resolution.

# Exhibit B 8

**3. The Cash Economy.**  Underreported income (and related self-employment tax) from the so-called "cash economy" is probably the single largest component of the "tax gap."  It may exceed $100 billion per year.  Because income from the cash economy is not subject to information reporting, many of the IRS's traditional means of enforcement are unlikely to be effective in addressing it.  The IRS has a number of initiatives that could be effective if coordinated and pursued more aggressively.  However, no single function coordinates research, outreach, and compliance initiatives aimed at improving reporting compliance among cash economy participants.  Nor does the IRS give these initiatives the same level of attention as other initiatives, such as those addressing tax shelters or the Earned Income Tax Credit (EITC).  The IRS must develop a comprehensive strategy for addressing the cash economy if it is to significantly reduce the tax gap.

**4. Training of Private Debt Collection Employees.**  In or around July of 2006, the IRS's Private Debt Collection (PDC) initiative will go into operation.  The PDC initiative marks a dramatic departure from traditional federal tax collection practice in that private collection firms will now be seeking payment from taxpayers with delinquent accounts, arranging installment agreements, and obtaining taxpayers' financial information over the phone.  The National Taxpayer Advocate is concerned about taxpayers interacting with private collection agents who have no understanding of important tax laws and will be trained by the contractors instead of the IRS.  With the abundance of tax experts employed at the IRS, it only makes sense to use the IRS's expertise to directly train private collectors at a level that approximates the training received by new IRS collection employees.

**5. EITC Exam Issues.**  In the past few years, the IRS has made significant progress in improving the administration of the EITC.  Despite this progress, problems still exist for taxpayers subject to EITC examinations and recertification.  These problems include delays in exam and recertification procedures, low taxpayer response rates, a lack of standardized treatment in recertification cases, and problems with documentation.  The National Taxpayer Advocate recommends that the IRS continue to identify and adopt measures designed to ease the burden on taxpayers and improve the current EITC examination and recertification processes.

**6. Levies on Social Security Payments.**  In general, recipients of Social Security benefits are elderly or disabled workers, or the surviving dependents of deceased workers.  The IRS continues to process levies on Social Security payments without sufficient managerial review, causing undue burden on a vulnerable population of taxpayers.  The National Taxpayer Advocate urges the IRS to implement safeguards that would prevent levies from being imposed on Social Security payments to low income and other at-risk taxpayers.

**7. Appeals Campus Centralization.**  The IRS Office of Appeals ("Appeals") has centralized its work on certain types of cases at six IRS campuses; these cases were previously resolved in field offices closer to taxpayers.  Appeals campus centralization is aimed at decreasing the time it takes for a taxpayer to resolve a case.  While this aim is appropriate and admirable, the National Taxpayer Advocate is concerned that centralizing Appeals case resolution may actually increase taxpayer burden.  Centralization may reduce opportunities for taxpayers to have their cases resolved at the local level, diminish working relationships between taxpayers and Appeals employees, increase emphasis on processing at the expense of independent judgment, and diminish service for low income and unrepresented taxpayers.  The National Taxpayer Advocate urges Appeals to alleviate these problems and protect taxpayers' appeal rights by developing specific training that will help employees carry out Appeals' independent mission in the campus

environment. We recommend that Appeals monitor campus activity to ensure that taxpayers – particularly low income taxpayers – receive full and fair consideration of their cases and are adequately notified of their right to request a case transfer to a local Appeals office.

**8. Refund Anticipation Loans: Oversight of the Industry, Cross-Collection Techniques, and Payment Alternatives**. Given that a significant percentage of RAL customers are EITC recipients, the IRS has a compelling reason to consider improved oversight of the industry as well as seriously consider alternative refund delivery methods. The IRS contributes to the demand for Refund Anticipation Loans (RALs) by: (1) failing to deliver refunds in the quickest manner possible and (2) failing to provide RAL alternatives for the "unbanked." It is also unclear if RAL customers fully understand the ramifications of cross-collection provisions in standardized RAL contracts, or if customers would even purchase the products if they were adequately informed of the cross-collection practices. The National Taxpayer Advocate recommends that the IRS review the effect of its Revenue Protection Strategy (RPS) on refund turnaround times and work with the Department of Treasury to develop alternative means of delivering refunds to taxpayers.

**9. Identity Theft.** Identity theft occurs when someone uses another individual's personal information without permission to commit fraud or other crimes. Although the most common type of identity theft involves consumer fraud, an increasing number of identity theft victims find they need to contact the IRS to untangle their tax accounts. The National Taxpayer Advocate urges the IRS to resolve the tax issues faced by victims of identity theft more quickly and efficiently, which may require coordination between the IRS and other federal agencies.

**10. Complexity of the Employment Tax Deposit System.** The Internal Revenue Code places significant responsibilities on employers for depositing, reporting, filing, and paying employment taxes. Recent data shows that the IRS assesses failure to deposit (FTD) penalties on one out of every 16 employment tax returns, yet eventually abates more than 60 percent of the FTD penalty amounts it originally assessed. This suggests that the rules and regulations governing federal employment tax deposits are overly complex, presenting significant compliance problems for employers and administrative challenges for the IRS.

**11. Automated Collection System Levy Releases.** Collection efforts through the IRS's Automated Collection System (ACS) can result in levies of bank accounts, wages, or other income such as Social Security. In response to these levies, taxpayers will contact the IRS seeking to enter into a collection alternative, such as an installment agreement. The IRS can also designate an account as "currently not collectible" if the taxpayer can demonstrate a financial hardship. The Internal Revenue Code and Treasury Regulations require that the IRS promptly release levies when taxpayers enter into installment agreements or when they demonstrate the existence of a hardship. Some taxpayers encounter problems with the levy release, including clerical errors, delays that result in additional levies on taxpayer assets or income, or the IRS not returning levy proceeds when a delayed levy release results in additional levies. Delays are also due in part to taxpayers' failure to request expedited levy releases so that the release can be faxed to the third party levy source. The IRS has improved the levy release process for currently-not-collectible accounts and has agreed to consider similar system changes for installment agreements, and require additional training for employees. We encourage the IRS to consider revising its procedures so that all levy releases are assumed to require expedited procedures.

**12. Regulation of Electronic Return Originators.** Electronic Return Originators (EROs), along with return preparers, are taxpayers' entry point into the tax system and have unprecedented access to taxpayers' financial data and social security numbers. As such, EROs should be closely monitored to protect taxpayers, but the IRS's current regulation of EROs is minimal. The National Taxpayer Advocate recommends the IRS increase its efforts, in part by making more visits to EROs, tracking EROs that are not filing any tax returns, and requiring those non-active EROs to recertify. The National Taxpayer Advocate further recommends that the IRS consolidate end-to-end responsibility for EROs, from approval of applications to monitoring ERO activities, in one IRS organization and develop a long-term strategic plan for the e-file program and EROs to ensure adequate and effective oversight.

**13. Limited Scope of Backup Withholding Program.** Underreporting of individual income tax is the single largest source of the tax gap, accounting for over half of the gross tax gap. Backup withholding is one of the tools available to the IRS as it attempts to narrow the gap. The IRS has the authority to require payors to deduct and withhold tax under certain conditions, such as when a recipient fails to furnish a valid Taxpayer Identification Number. However, the IRS has not implemented the backup withholding program effectively and has failed to provide noncompliant taxpayers with sufficient incentive to fulfill their reporting obligations.

**14. Accessibility of e-Services for Tax Practitioners.** The IRS's web-based e-Services suite is available to tax practitioners who are active participants in the IRS e-file program and electronically file five or more accepted individual income tax returns in a filing season. The IRS uses e-Services "as a reward and incentive for e-filing" rather than addressing it from a customer service-oriented perspective. This policy of limiting access to e-Services deprives many highly trained and experienced tax practitioners of an extremely useful and efficient tool, and has the unintended result of making the Electronic Account Resolution program available to preparers without regard to their professional qualifications. The National Taxpayer Advocate recommends that the IRS provide access to e-Services to all practitioners qualified to practice before the IRS pursuant to Circular 230. She also recommends that the IRS expand access to the Transcript Delivery System in e-Services to all taxpayers, while taking the necessary security measures to safeguard confidential tax data on the Internet.

**15. Mandatory Briefings for IRS Employees on TAS.** Internal Revenue Code § 7803(c)(2)(C)(ii) requires the National Taxpayer Advocate to develop guidance for all IRS officers and employees, outlining the criteria for referral of cases to the Taxpayer Advocate Service (TAS). The IRS has denied the request of the National Taxpayer Advocate to include TAS training among its annual mandatory briefings for all employees. Instead, the IRS has agreed to provide TAS training to contact employees in the Wage and Investment and Small Business/Self-Employed operating divisions on a one-time basis, and urges TAS to train the rest of the employees through methods such as the IRS intranet, inserts in employee Earnings & Leave statements, and "wallet cards." The National Taxpayer Advocate urges the IRS to rethink its position and grant her request to make TAS training mandatory for all employees.

**16. Allowable Expense Standards for Collection Decisions.** Each year the IRS publishes schedules of national and local expense allowance standards. These standards reduce the subjectivity involved when IRS employees consider the collection alternative to pursue when a taxpayer is having difficulty paying the IRS (*e.g.*, an offer-in-compromise, installment agreement, or suspension of collection). However, for any given taxpayer, the expense amounts provided by the standards will not necessarily cover his or her reasonable basic living expenses. The IRS relies on the subjective judgment of its employees to allow more than the

standard amounts when appropriate.  Many practitioners report that the IRS often fails to allow such additional amounts and uses the standards as an excuse to reject reasonable collection alternatives.  Our report discusses a number of reasons that the standards are often inadequate and provides recommendations for improving them, encourages IRS employees to allow additional amounts when appropriate, and addresses practitioner concerns.

**17. Inadequate Taxpayer Service to Exempt Organizations, Resulting in Unnecessary Penalties.**  Most tax exempt organizations are very small entities with meager resources and modest budgets that rely largely on the services of volunteers.  Tax filing requirements for these organizations are complicated and time consuming.  The IRS automatically assesses penalties on these organizations when they do not comply precisely with these complex requirements.  Over the last 13 fiscal years, however, the IRS has abated almost 75 percent of the dollars assessed for filing-error penalties on exempt organizations because the organizations later corrected their mistakes. This high abatement rate is an unnecessary waste of IRS resources and indicates that exempt organizations would avoid filing errors if better informed of their filing obligations.  Currently, however, the IRS substantially underfunds customer service to exempt organizations; for example, only 60 percent of organizations that call the IRS Tax Exempt and Government Entities Division toll-free help line receive service.  The National Taxpayer Advocate urges the IRS to reconsider its funding decisions with respect to exempt organization customer service and better utilize the resources available.

**18. Direct Deposit of Income Tax Refunds.**  Under present law, there are no procedures for the IRS, the government's Financial Management Service, and financial institutions to address inadvertent errors by taxpayers relating to direct deposits of tax refund checks.  The taxpayer and the financial institution must resolve any dispute over the accuracy of a direct deposit refund, with little assistance from the IRS.  The National Taxpayer Advocate recommends that the IRS consider all of the recommendations put forth by the Direct Deposit Task Force as well as other procedural improvements that can eliminate the potential for a misdirected direct deposit refund.  The National Taxpayer Advocate also encourages the IRS to continue to work with financial institutions in an effort to recover misdirected funds.

**19. Innocent Spouse Claims.**  One spouse (called the "innocent spouse") may apply to the IRS for relief from joint liability for deficiencies or underpayments attributable to the other spouse.  The IRS has difficulty communicating with taxpayers regarding the requirements for relief and how to fill out related forms.  As a result, the IRS is able to grant fewer than three in ten requests for relief, and despite recent cuts in processing time, the IRS collectively takes more than two years to process requests that are appealed.  Various IRS computer systems contain inconsistent information about innocent spouse claims processed by the Appeals function.  These inconsistencies make it more difficult for the IRS to identify the source of any processing delays.

**20. Limitations of Collection Account Databases.**  The lack of access to full taxpayer account histories in one place makes it difficult for IRS contact employees to respond to taxpayers' questions or provide proper guidance on potential case resolutions.  This inaccessibility often leads taxpayers to seek the assistance of the Taxpayer Advocate Service.  The Desktop Integration (DI) system provides IRS employees with greater access to the information needed, but not all systems interface with DI and not all IRS employees are required to use DI.  The National Taxpayer Advocate urges the IRS to expand the number of systems interfacing with DI as well as requiring all IRS contact employees to use DI.

**21. Reasonable Cause Assistant (RCA).** The IRS does not utilize the Reasonable Cause Assistant (RCA) program -- a computer-based decision support tool -- for all determinations of penalty abatements for reasonable cause. In addition, the high rate of RCA abatement conclusions indicates that the IRS needs to eliminate unnecessary penalty assessments. Because existing IRS data does not sufficiently differentiate RCA cases from non-RCA cases, the IRS cannot effectively analyze the penalty systems in place. The low rate at which RCA users abort the program's conclusions may indicate that RCA does not encourage users to override an RCA decision even when appropriate. The National Taxpayer Advocate urges the IRS to review RCA and all related training and guidance materials to determine whether the application actually gives the user the flexibility to fully consider unique facts and circumstances.

NATIONAL TAXPAYER ADVOCATE 2005 ANNUAL REPORT TO CONGRESS

EXECUTIVE SUMMARY

## LEGISLATIVE RECOMMENDATIONS

Internal Revenue Code § 7803(c)(2)(B)(ii)(VIII) requires the National Taxpayer Advocate to recommend legislative changes to resolve problems encountered by taxpayers. This report includes seven proposals classified as Key Legislative Recommendations and three proposals classified as Additional Legislative Recommendations.

### KEY LEGISLATIVE RECOMMENDATIONS

**Tax Reform Core Principles: A Taxpayer-Centric Approach.** Two months ago, the President's Advisory Panel on Federal Tax Reform submitted a report to the Secretary of the Treasury proposing significant revisions to the Internal Revenue Code, and it appears that Congress may give serious consideration to fundamental tax reform in the next year or two. We recommend that Congress give priority emphasis to six core principles as it considers various tax-reform proposals: (1) the tax system should not "entrap" taxpayers; (2) the tax laws should be simple enough so that taxpayers can prepare their own returns without professional help, simple enough so that taxpayers can compute their tax liabilities on a single form, and simple enough so that IRS telephone assistors can fully and accurately answer taxpayers' questions; (3) the tax laws should anticipate the largest areas of noncompliance and minimize the opportunities for such noncompliance; (4) the tax laws should provide some choices, but not too many choices; (5) the tax laws should not necessarily avoid refundable credits but, if it includes them, should design them in a way that is administrable; and (6) the tax system should incorporate a periodic review of the tax code – in short, a sanity check.

**Measures to Reduce Noncompliance in the Cash Economy.** The IRS estimates that the annual federal tax gap for 2001 was between $257 billion and $298 billion. The IRS receives about 130 million income tax returns each year. Thus, every taxpayer is forced to pay an average $2,000 "surtax" each year to subsidize noncompliance. IRS data show that the highest rate of noncompliance by far is attributable to transactions that are not reported to the IRS on a Form W-2, Form 1099, Schedule K-1, or similar form. These unreported transactions occur largely in the so-called "cash economy." To reduce the tax burden on compliant taxpayers, we recommend that Congress (1) create a three-pronged reporting and payment system that encourages compliance in certain cash economy transactions by (a) instituting backup withholding on payments to taxpayers who have demonstrated "substantial noncompliance"; (b) releasing backup withholding on payments to "substantially noncompliant" taxpayers who have demonstrated "substantial compliance" and agree to schedule and make future estimated tax payments through the IRS Electronic Funds Transfer Payment System (EFTPS); and (c) providing that payors will not be required to institute backup withholding on payments to independent contractors that present payors with a valid IRS "compliance certificate"; (2) require the IRS to promote the making of estimated tax payments through EFTPS; (3) authorize voluntary withholding agreements between independent contractors and service recipients; and (4) require third-party information reporting for certain payments to corporations with 50 or fewer shareholders.

**Tax Reform for Families:  A Common Sense Approach**.  The Internal Revenue Code contains six provisions related to a taxpayer's family status: the Earned Income Tax Credit (EITC), the Child Tax Credit (CTC), the Child and Dependent Care Credit, personal and dependency exemptions, the head-of-household filing status, and the "separated spouse" rules of IRC § 7703(b).  Each of these six provisions directly or indirectly confers a tax benefit on taxpayers who meet the various eligibility requirements, and at least one of these six provisions impacts every U.S. individual taxpayer.  To build upon the recently enacted Uniform Definition of Child and to further simplify the family status provisions, we recommend that Congress (1) combine the exemptions, CTC, and part of the EITC and head of household filing status into a refundable Family Credit comprising two components — one for the taxpayer (and his or her spouse) and one for whomever is the "main carer" of a child or children based on a per-child amount; (2) separate the Child and Dependent Care Credits into two credits; (3) eliminate head-of-household filing status; (4) modify the EITC so that it provides a refundable credit to low income workers based solely on the taxpayer's earned income and is available to workers age 18 and over, regardless of the existence of children in the household; (5) permit married taxpayers who have a legal and binding separation agreement and who live separate and apart as of the last day of the calendar year to be considered "not married" for purposes of filing status; and (6) provide a separate credit for noncustodial parents of Qualifying Children who pay all child support obligations due for that calendar year.

**Another Marriage Penalty:  Taxing the Wrong Spouse**.  The federal income tax liabilities of married persons are often imposed on or collected from a spouse who did not earn the income subject to tax, *i.e.*, the "wrong" spouse.  Current law provides some relief to a spouse held liable for tax on the other spouse's income, at least in cases where the first spouse did not know about the income and did not significantly benefit from it.  However, the relief rules are sometimes overly narrow, complex, costly for the IRS to administer, and burdensome for taxpayers.  Even if relief rules apply so that one spouse is not liable for his or her spouse's tax, the IRS may be able to *collect* the liability from the non-liable spouse in community property states.  We recommend that Congress amend the law to tax the "right" spouse in the first instance and to prevent the IRS from undermining this rule through its collection efforts.  Our recommendation would better align each person's tax with his or her individual ability to pay, significantly reduce complexity, and minimize the impact of state property and collection laws that subject taxpayers to different amounts of federal income tax solely because they reside in different states.

**Requiring Brokers to Track and Report Cost Basis for Stocks and Mutual Funds**.  Many financial institutions through which investors own stocks and mutual funds ("brokers") do not currently keep track of an investor's basis in the stocks or mutual funds, and no brokers report basis information to both taxpayers and the IRS on a Form 1099-B.  The absence of information reporting creates serious problems for many taxpayers and the government alike.  For taxpayers, tracking basis can be extraordinarily complex and many taxpayers seeking to comply with the law find that they simply cannot do so with accuracy, leaving them exposed if audited.  From the government's perspective, the absence of information reporting enables underreporting by taxpayers who deliberately overstate their basis (thereby reducing their gain or even generating a loss), because they know the IRS generally cannot detect errors in basis reporting in the absence of an audit.  One recent estimate puts the revenue loss to the government from such underreporting at $250 billion over the next 10 years.  We recommend that brokers be required to keep track of an investor's basis, transfer basis information to a successor broker if the investor transfers the stock or mutual fund holding, and report basis information to the taxpayer and the IRS (along

with the proceeds generated by a sale) on Form 1099-B. To offset the cost of implementing a tracking system, we note that Congress could provide a one-time tax credit for brokers.

**Tracking Cost Basis as a Result of Estate Tax Repeal**. Under the current estate tax regime, persons acquiring property from a decedent are able to use a "stepped-up" basis equal to the fair market value of the property at the date of the decedent's death (or, if they so elect, on the date six months after the decedent's death). Once the estate tax is repealed in 2010, these taxpayers must use the modified carryover basis, which may require extremely complex calculations to determine the property's adjusted basis in the hands of the decedent just prior to death. Reconstructing adjusted basis in property is difficult enough while taxpayers holding such assets are alive; after death, it can become impossible. Congress should explore ways to lessen this compliance burden.

**Restructuring and Reform of Collection Due Process Provisions**. Collection Due Process (CDP) hearings afford taxpayers the opportunity to obtain meaningful review of IRS collection actions by an impartial IRS Appeals Officer and the courts, either after the initial filing of a Notice of Federal Tax Lien or before an initial levy on a taxpayer's assets. The current statutory CDP rights are both under-inclusive and over-inclusive, denying judicial review of some lien and levy actions while encouraging counterproductive behavior on the part of some taxpayers and the IRS. To enhance taxpayer protections in the tax collection process while ensuring that the IRS's ability to collect the correct amount of tax is not unreasonably impaired, we recommend that Congress (1) require the IRS to issue a separate CDP Right to Hearing notice at the time it undertakes the first levy action with respect to a tax, describing with specificity the levy source and date such levy will occur and providing the taxpayer with the name and contact information of an IRS employee to call about the levy action; (2) consolidate judicial review of CDP hearings in the United States Tax Court, clarify the role and scope of Tax Court oversight of Appeals' continuing jurisdiction over CDP cases, and address the Tax Court's standard of review for the underlying liability in CDP cases; and (3) codify both the IRS Collection Appeals Program and the IRS Audit Reconsideration Process and specifically include Audit Reconsideration as an alternative to be considered at CDP hearings.

## ADDITIONAL LEGISLATIVE RECOMMENDATIONS

**Direct Deposit of Income Tax Refunds**. Under present law, there are no procedures in place for the IRS, the government's Financial Management Service, and financial institutions to address inadvertent errors by taxpayers relating to direct deposits of tax refund checks. Disputes over the accuracy of a direct deposit refund due to taxpayer or preparer error must currently be resolved between the taxpayer and the financial institution itself, with little assistance from the IRS. The National Taxpayer Advocate recommends that Congress amend the Internal Revenue Code to create a process through which the IRS and financial institutions work together to identify the incorrect recipient of a direct deposit refund and require the return of the improperly deposited funds.

**Social Security Levies.** Current law exempts from IRS levy certain pension and annuity payments (including payments under the Railroad Retirement Act), but it does not exempt from levy retirement, survivors, and disability insurance payments made under the Social Security Act. Levies by the IRS on Social Security benefits can cause particularly severe hardships for low income taxpayers who rely on these payments as their primary or sole source of income. The National Taxpayer Advocate recommends that Congress exempt Social Security payments altogether from IRS levy. In the alternative, the National Taxpayer

Advocate recommends that Congress extend the exemption amount applicable to manual levies to automated levies under the Federal Payment Levy Program.

**Debt Collection Techniques on EITC Benefits by the Refund Anticipation Loan Industry.** Refund anticipation loan (RAL) customers may not completely understand the ramifications of the debt offset collection provisions included in standardized RAL contracts. The provisions give the contracting financial institution or bank the authority to offset RAL proceeds to satisfy outstanding delinquencies owed on RALs previously issued by either the contracting bank or a third-party bank. The practice allows banks to effectively seize EITC benefits and transfer the funds to themselves or third-party banks to satisfy these prior delinquencies. The National Taxpayer Advocate recommends that Congress amend IRC § 32 to prohibit banks from exercising their right to set off on EITC benefits, a protection that currently exists for Social Security benefits. At the very least, the law should prohibit banks from transferring any portion of a federal tax refund representing the EITC to a third-party bank.

NATIONAL TAXPAYER ADVOCATE 2005 ANNUAL REPORT TO CONGRESS

EXECUTIVE SUMMARY

## THE MOST LITIGATED TAX ISSUES

Internal Revenue Code § 7803(c)(2)(B)(ii)(X) requires the National Taxpayer Advocate to identify the ten tax issues most often litigated in the Federal courts and to classify those issues by the type of taxpayer affected. The cases we reviewed were decided during the fiscal year that began on June 1, 2004, and ended on May 31, 2005. Our analysis of issues and cases for this year's report suggests that tax law complexity is a significant cause of tax litigation and constitutes a continuing burden on both taxpayers and the government.

**Appeals from Collection Due Process Hearings under IRC §§ 6320 and 6330.** Collection Due Process (CDP) hearings provide taxpayers an opportunity for independent review of the first lien filed by the IRS or the first proposed levy action with respect to a tax liability. As in 2003 and 2004, CDP was the most frequently litigated tax issue in the federal courts. We reviewed 209 decisions during the current period. Our analysis shows that collection alternatives were litigated more than any other such issue in these cases (40 out of 209 cases). Taxpayers prevailed in five cases. Taxpayers also attempted to litigate the underlying liability in 39 cases; however, in 26 cases the courts ruled that taxpayers were unable to litigate that issue because they had another opportunity to do so earlier in the process.

**Gross Income under IRC § 61 and Related Sections.** The issue of what constitutes gross income for purposes of Internal Revenue Code (IRC) § 61 has been among the Most Litigated Issues since 1998, the first year that the National Taxpayer Advocate was required to report on litigated issues. Gross income is again the second most litigated issue this year. The cases generally fell into one of four categories: (1) awards or settlements, (2) disability and Social Security income, (3) constructive dividends, and (4) unreported income. Taxpayers prevailed, in whole or in part, in 25 out of 108 cases. While no clear patterns are evident, taxpayers appeared to have the most difficulty in cases where other sections of the Internal Revenue Code exclude income items that would otherwise be taxable.

**Failure to File Penalty under IRC § 6651(a)(1).** The number of cases involving the failure to file penalty under IRC § 6651(a)(1) increased by 60 percent from last year to make this the third most litigated issue. We reviewed 75 cases involving the failure to file penalty in federal courts. Taxpayers seek relief from the penalty by asserting "reasonable cause" for the failure to file a timely return. Taxpayers argued that varying excuses constitute reasonable cause, including illness of the taxpayer or family member, reliance on a tax professional, reliance on a spouse, or ignorance of the law. Taxpayers prevailed in five of 75 cases (7 percent).

**Trade or Business Expenses under IRC § 162 and Related Code Sections.** The deductibility of trade or business expenses is perennially one of the ten most litigated tax issues in the federal courts. We reviewed 67 cases that included trade or business expense issues. The courts affirmed the IRS position in nearly 75 percent of the cases, while taxpayers prevailed just seven percent of the time; the remaining cases resulted in split decisions. Substantiation of trade or business expenses was the primary sub-issue litigated by taxpayers, who often failed to provide sufficient documentation of expenses they incurred, causing them to lose otherwise permissible deductions. The IRS can assist these taxpayers,

and minimize litigation, by continuing to provide clear guidance on the deductibility of trade or business expenses.

**Frivolous Issues Penalty under IRC § 6673.** We reviewed 67 cases in which taxpayers litigated the IRC § 6673 penalty for advancing frivolous arguments or conducting litigation solely for delay. This represents a 90 percent increase over last year's 35 cases. In these cases, the Tax Court considers whether taxpayers' arguments or actions warrant application of the penalty. IRS counsel can move for imposition of the penalty or the court can do so on its own initiative. Courts consistently held that penalties were warranted where the same type of "boilerplate" arguments had been held by other courts to be frivolous, having no basis in law or fact. The increase in these cases suggests that the IRS is more willing to seek imposition of the penalty and courts are more willing to sustain it.

**Negligence Penalty under IRC § 6662(b)(1).** We reviewed 57 cases involving the accuracy-related penalty under IRC § 6662(b)(1). This penalty is assessed against taxpayers for underpayment of tax due to the taxpayer's negligence or disregard of tax rules or regulations and was generally decided in conjunction with other issues. The IRS prevailed in 39 cases (or 68 percent), while taxpayers prevailed in 13 cases (23 percent), and five cases ended in split decisions. A common reason for rulings against taxpayers was the lack of any evidence that there was reasonable cause and the taxpayers acted in good faith. However, the taxpayer victories raise the question of whether the IRS always exercises proper oversight on the imposition of the negligence penalty. The IRS abates a large percentage of other types of penalties. This fact and the relatively significant number of taxpayers who prevailed on reasonable cause indicate that the IRS should study whether the accuracy-related penalty is achieving its original goal of promoting voluntary compliance by encouraging accurate tax returns.

**Family Status Issues under IRC § 2, 21, 24, 32, and 151.** The Earned Income Tax Credit (EITC), dependency exemption, head of household filing status, child tax credit, and child and dependent care credit frequently arise in the same cases and involve similar factual determinations. We reviewed 45 cases concerning these issues, two-thirds of them dealing with multiple credits and issues where the determination of one issue often affected others. Our analysis shows that taxpayers who wish to claim the family status credits and deductions often do not understand the qualification requirements or how to properly satisfy them. Taxpayers were represented by counsel in only six of the 45 cases, even though many were highly fact-specific and involved a complicated web of statutory provisions.

**Relief from Joint and Several Liability under IRC § 6015.** Spouses filing joint federal income tax returns are jointly and severally liable for any deficiency or tax due. IRC § 6015 provides three avenues for relief from joint and several liability. We reviewed 45 federal court opinions involving relief under IRC § 6015, with 33 cases decided in favor of the IRS, 11 in favor of the taxpayer, and one split decision. While the courts considered many factors in determining the appropriateness of relief, the most significant was whether the requesting taxpayer had actual or constructive knowledge of the tax deficiency. Taxpayers' success or failure often turns on their willingness and ability to provide documentation to support their claims.

**Summons Enforcement under IRC § 7604.** The IRS has the authority to summon the production of books, records, or testimony from witnesses when investigating either a civil or criminal tax liability. The court ruled in favor of the IRS in 42 of the 44 cases reviewed, while a taxpayer prevailed in one case and another ended in a split decision. In at least nine of the

cases, the summons in question was issued to third parties who the IRS believed were marketing unlawful tax shelters to taxpayers, reflecting the IRS's increased attention to shelter activity. As the IRS becomes more aggressive in its enforcement initiatives, it will likely increase its use of the summons enforcement tool, and the courts will see a growing number of these cases.

**Trust Fund Recovery Penalty under IRC § 6672.** The Trust Fund Recovery Penalty is a means by which the government holds certain persons responsible for willfully failing to withhold or remit the trust fund portion of payroll taxes. We reviewed 34 opinions in which the TFRP was an issue. Taxpayers prevailed in whole or in part in 13 of the 34 cases, though in three cases the court was denying the IRS's motion for summary judgment, thereby requiring the parties to go to trial. The cases often involved officers of small businesses who had some role in determining expenditures. As one court noted, these cases often reflect the difficult choices for corporate officers who are faced with the dilemma in a struggling business between losing one's job or violating the nation's tax laws. Still, these choices do not excuse the responsibility of paying payroll taxes.